## UNITED STATES v. SOUTHERN RY. CO.

(District Court, N. D. Alabama, S. D. September 25, 1908.)

### No. 115.

1. COMMERCE (§ 58*)—REGULATION—SAFETY APPLIANCE ACTS.

The acts of Congress known as the "Safety Appliance Acts" (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], and amendments thereto, Act April 1, 1896, c. 87, 29 Stat. 85, and Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1907, p. 885]), are within the power conferred by the Constitution of the United States upon Congress, and are not violative of subdivision 3 of section 8 of article 1 thereof.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 77–86; Dec. Dig. § 58.*]

2. COMMERCE (§ 58*).

The safety appliance acts are not violative of the tenth amendment to the Constitution of the United States.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 77–86; Dec. Dig. § 58.*]

3. COMMERCE (§ 58*)—REGULATION—SAFETY APPLIANCES.

Congress, having determined by formative action to regulate the use of cars running upon a railroad between the states so as to provide for the use of certain safety appliances on such cars running thereon, has by said acts taken affirmative action in regard thereto, and to this extent the action by Congress is exclusive.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 58.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

4. COMMERCE (§ 58*)—INTERSTATE COMMERCE—SAFETY APPLIANCE ACT—"RAILROAD ENGAGED IN INTERSTATE COMMERCE."

The reference in Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885), to "any railroad engaged in interstate commerce" applies to the interstate highway as an instrument of commerce; and, Congress having taken affirmative action in reference thereto, its control of the interstate highway being thereby conclusive, the statute requiring vehicles running on the interstate highway to be provided with certain safety appliances embraces all uses of the highway, whether for the

transportation of interstate traffic or for the transportation of traffic from a point within a state to another point within the same state by common carriers engaged in interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 77–86; Dec. Dig. § 58.*]

5. COMMERCE (§ 58*)—INTERSTATE COMMERCE.

The principle decided in the employer's liability cases (207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297) is not decisive of the issues of this case. In the former case the statute under consideration was addressed to the individuals or corporations engaged in interstate commerce, whereas in the case at bar the statutes are addressed alone to the use of an instrument of interstate commerce, viz., an interstate railroad highway.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 58.*]

6. COMMERCE (§ 58*)—RAILROADS.

Congress has power, not only under the commerce clause of the Constitution to regulate interstate commerce and the instrumentalities thereof, but also by virtue of its police power to provide for the protection of railroad employés and the traveling public by prescribing safeguards for vehicles, etc., used over an interstate highway or any portion thereof. Under the safety appliance acts, therefore, a failure to provide vehicles, etc., with the safety appliances required by the acts is a violation thereof, when the trains, cars, etc., are operated over any portion of the highway, even though that portion be from a point within a state to another point within the same state.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 58.*]

7. COMMERCE (§ 58*) — INTERSTATE COMMERCE — REGULATION—POWER OF CONGRESS.

Railroads engaged in interstate commerce are subjects of such commerce, national in their character, requiring uniformity of regulation, and the power of Congress over the same is exclusive. This power, like all others vested in Congress, is complete in itself, may be exercised to the utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. The sovereignty of Congress, though limited to specified objects, is plenary as to those objects. The power over commerce among the several states is vested in Congress as absolutely as it would be in a single government, having in its Constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 77–86; Dec. Dig. § 58.*]

(Syllabus by the Court.)

8. COMMERCE (§ 1*)—WHAT CONSTITUTES.

Transportation of persons and property is "commerce."

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 2; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 2, pp. 1287–1298; vol. 8, pp. 7606–7607.]

At Law. On demurrer to petition to recover penalties for violation of safety appliance acts.

O. D. Street, U. S. Atty., and Roscoe F. Walter, Sp. Counsel, for the United States.

Weatherly & Stokely, for defendant.

HUNDLEY, District Judge. This is an action brought by the United States against the Southern Railway Company to recover from the defendant railway penalties for failure to equip its cars with automatic couplers and other devices required by the acts of Congress known as the "Safety Appliance Acts." Act March 2, 1893, c. 196,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), as amended by Act April 1, 1896, c. 87, 29 Stat. 85, and Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885). The petition is in five different counts or causes of action, each count referring to a separate and distinct car which, it is averred, was not provided with the safety appliances required by the acts of Congress. The first count or cause of action is in words and figures as follows, to wit:

"For a first cause of action, plaintiff alleges that said defendant is a common carrier engaged in interstate commerce by railroad among the several states and territories of the United States, particularly the states of Virginia, Tennessee and Alabama.

"Plaintiff further alleges that in violation of the act of Congress, known as the 'Safety Appliance Act,' approved March 2, 1893 (contained in 27 Statutes at Large, page 531), as amended by an act approved April 1, 1896 (contained in 29 Statutes at Large, page 85), and as amended by an act approved March 2, 1903 (contained in 32 Statutes at Large, page 943), said defendant, on or about February 8, 1907, hauled on its line of railroad one car, to wit, Southern No. 70057, used in the movement of interstate traffic, to wit, coal consigned from Birmingham, in the state of Alabama, to Charleston, in the state of South Carolina.

"Plaintiff further alleges that on or about said date defendant hauled said car with said interstate traffic over its line of railroad from Birmingham, in the state of Alabama, in a southerly direction, within the jurisdiction of this court, when the coupling and uncoupling apparatus on the 'A' end of said car was out of repair and inoperative, the chain connecting the lock pin or lock block to the uncoupling lever being broken on said end of said car, thus necessitating a man or men going between the ends of the cars to couple or uncouple them, and when said car was not equipped with couplers coupling automatically by impact, and which could be uncoupled without the necessity of a man or men going between the ends of the cars, as required by section 2 of the safety appliance act, as amended by section 1 of the act of March 2, 1903.

"Plaintiff further alleges that by reason of the violation of the said act of Congress, as amended, defendant is liable to plaintiff in the sum of one hundred dollars."

The second cause of action differs from the first only in referring to the car hauled as follows:

"Said car being one regularly used in the movement of interstate traffic and at the time of said violation being loaded with coal consigned from Birmingham, Alabama, to Selma, Alabama.

"Plaintiff further alleges that said line of railroad over which said car was hauled on said date is a part of a through highway over which interstate traffic is being continually hauled from one state in the United States to another state in the United States."

The third and fifth causes of action are identical with the second cause of action, with the exception of averring the breach of the requirements of the statute being on a different car, and the fourth cause of action is identical with the first cause, with this same exception.

To the various counts or causes of action stated in the petition the defendant railway company filed the following demurrer:

"Comes the defendant, the Southern Railway Company, and demurs to the petition filed in this cause as a whole, and to each and every separate part thereof purporting to state a separate cause of action from first to fifth, inclusive, on the ground that the said act of Congress, upon which said petition is based, and known as the 'Safety Appliance Act,' approved March 2, 1893,

as amended by an act approved April 1, 1896, and as amended by an act approved March 2, 1903, is violative of the Constitution of the United States in the following particulars, namely:

"(1) That it exceeds the power granted to Congress of the United States by the Constitution thereof, and especially by subdivision 3 of section 8 of article 1 thereof, in that it attempts, under the guise of regulating commerce among the several states, to regulate the use and operation of vehicles and other instrumentalities of railroads which are used in the carrying on of intrastate commerce.

"(2) Said act is not authorized by said subdivision 3 of section 8 of article 1 of the Constitution of the United States.

"(3) Said act authorizes, or attempts to authorize, the imposition of a penalty upon railroad companies engaged in interstate commerce, irrespective of whether or not the cars, vehicles, or other instrumentalities used by such railroad company is at the time of the use of such car, vehicle, or other instrumentality engaged exclusively in intrastate commerce.

"(4) Said act purports to apply to a car or other instrumentality of a common carrier solely because used or engaged regularly in interstate commerce, without respect to whether or not at the time it is actually being engaged exclusively in the movement of interstate traffic.

"(5) Said act is violative of article 10 of the Constitution of the United States.

"And the defendant further demurs specially to that part of the petition setting forth a second cause of action, and separately and severally to that part of the petition setting forth a third cause of action, and separately and severally to that part of said petition setting forth a fifth cause of action, on the following ground, namely:

"(1) Because each of said parts of said petition shows on its face that the movement of the car in the particular case was a local movement, namely: In the second cause of action a movement of Southern car No. 69319, loaded with coal, 'consigned from Birmingham to Selma, Alabama'; in the third cause of action, Southern car No. 97921, loaded with coal, 'consigned from Birmingham to Selma, Alabama'; and the fifth cause of action, T. C. S. & D. No. 19832, loaded with coke, 'consigned from Pratt City, Ala., to Mobile, Alabama.'"

Three questions are thus presented for the decision of the court by this demurrer. The first is: Is the act of Congress approved March 2, 1893, with the amendments thereto, and commonly known as the "Safety Appliance Act," a valid exercise by Congress of the power delegated to it under the commerce clause of the Constitution of the United States? The second is: Has Congress, in the acts referred to, so assumed those powers reserved to the states as to render the acts abhorrent to the tenth amendment to the Constitution? The third question is: If they are a valid exercise of the right conferred upon Congress by the Constitution, is a proper cause of action stated under the second count in the petition and the other counts similar thereto?

It is argued by counsel for the defendant with great earnestness that the language employed in the act approved March 2, 1903, defining and declaring that the provisions and requirements of the original safety appliance act "shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce," renders the acts invalid, because they are thus made to apply with equal force to trains, locomotives, etc., engaged entirely within the states and with relation to intrastate commerce alone. In this connection it is also argued that the decision of the Supreme Court of the United States in the cases known as the "Em-

ployer's Liability Cases," 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297, is decisive of the first question presented, and this court is directed especially to the dissenting opinion of Mr. Justice Moody, in which he uses the following language in referring to the employer's liability act (Act June 11, 1906, c. 3073, 34 Stat. 232 [U. S. Comp. St. Supp. 1907, p. 891]):

"If the statute now before us is beyond the constitutional power of Congress, surely the safety appliance act is also void, for there can be no distinction in principle between them."

While a dissenting opinion is never binding upon the courts as a decisive statement of the law, yet the statement herein quoted, coming as it does from so high a source, is entitled to very great weight and influence in guiding the court to determine the issues here involved. If the learned justice is right in his conclusion that there can be no distinction in principle between the employer's liability act and the safety appliance acts, it follows as a matter of course that the decision of the Supreme Court of the United States in relation to the former act would apply with equal force to the latter acts, and I would deem it my duty to follow that court and declare the acts in question unconstitutional and void. The distinction between the principle decided in the Employer's Liability Cases and the safety appliance acts was not drawn in question when the former cases were pending before the Supreme Court of the United States, and I feel constrained to believe that the statement above quoted from Mr. Justice Moody was for that reason unadvisedly made; for the distinction between the two acts, with due respect to the learned justice, is in my humble judgment very marked. The conclusion arrived at by the majority of the court in its opinion in the Employer's Liability Cases was based upon the fact, shown both in the title and the body of the statute, that it dealt with all the concerns of individuals and corporations, and did not confine itself to the interstate commerce business which might have been done by such persons or corporations; in fine, that intrastate subjects were, with equal force and effect, embraced within the terms of the act. Says the Supreme Court in that case, after discussing the terms of the statute:

"From this it follows that the statute deals with all the concerns of the individuals or corporations to which it relates, if they engage as common carriers in trade or commerce between the states, etc., and does not confine itself to the interstate commerce business which may be done by such persons. Stated in another form, the statute is addressed to the individuals or corporations who are engaged in interstate commerce, and is not confined solely to regulating the interstate commerce business which such persons may do; that is, it regulates the persons because they engage in interstate commerce, and does not alone regulate the business of interstate commerce."

The very title of the employer's liability act shows that it was the intention of Congress to apply the terms of the act to "common carriers" engaged in interstate commerce, and not to the "business" of such commerce. Again, says the Supreme Court in the Employer's Liability Cases, supra:

"The act, then, being addressed to all common carriers engaged in interstate commerce, and imposing a liability upon them in favor of any of their em-

ployés, without qualification or restriction as to the business in which the carriers or their employés may be engaged at the time of the injury, of necessity includes subjects wholly outside the power of Congress to regulate commerce."

When we come to consider the safety appliance act, both in the title and body of the act, together with the application made by the amendment, the distinction which is decisive of the questions here raised becomes apparent. In the outset it is seen that the title of the act shows that the purpose of the legislation is "to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with certain appliances for the safety of the employés and the traveling public." When the first safety appliance act was enacted by Congress, which was the act of March 2, 1893, the penalties under the act were confined to any railroad company which uses "any car in interstate commerce" that is not provided with appliances referred to in the act. Surely there is no kind of construction which would hold that this reference could mean any car in intrastate commerce. By the terms of the act approved March 2, 1903, the application of the original act was enlarged, so as to make it apply "to all trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce, * * * and all other locomotives, tenders, cars and similar vehicles used in connection therewith." It is this language, it is claimed, which brings this statute within the principle decided in the Employer's Liability Cases. By the very terms of the act the distinction will be noted that, while the employer's liability act applies to "individuals and corporations," the safety appliance act, as amended, applies to the instrumentalities engaged in interstate commerce and the use of those instrumentalities "on any railroad engaged in interstate commerce." Here reference is made to the national interstate highway alone, used in interstate commerce, and by no system of reasoning can this reference be properly held to apply to an intrastate highway. As is said by the Supreme Court in the Employer's Liability Cases, supra (referring to the employer's liability act), "the statute is addressed to the individuals or corporations," while it is clear that in the case at bar the statute is addressed to the instrumentality of commerce, viz., the railroad—interstate highway. So that the question at issue before the court resolves itself simply into the proposition: Has Congress the right to regulate the interstate highway and the use of vehicles thereon? Has it authority to provide for the safety of employés and travelers while using the interstate highway? If Congress has the right to so regulate this interstate highway, does the inhibition of the statute apply to the use thereof for purposes of transportation of commerce between points entirely within a state? Has Congress a right, also, under its police authority, to say that this highway shall be safe and unobstructed?

I take it that it is unnecessary for me, at this late date in the history of our country, to cite authorities in support of the proposition that the transportation of persons and property is commerce; in other words, that the business of carriers is commerce, and when this business is

foreign or interstate it has been frequently decided that the power to legislate for its direct control is lodged within the power of Congress, and this power is paramount. It was decided in the Debs Case, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092, that the obstruction of such commerce was unlawful under the laws of the United States, could be suppressed by the armies of the United States, and at the instance of the United States could be enjoined in its courts. Speaking of the power of Congress to regulate commerce, Mr. Chief Justice Marshall, in the great case of Gibbons v. Ogden, 9 Wheat., on page 196, 6 L. Ed. 23, says:

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, and may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution."

Nor has this power of Congress to regulate commerce been held to apply only to persons or corporations engaged in that commerce, but it has been held to apply to every instrumentality of commerce. Says Mr. Justice Johnson in his concurring opinion in Gibbons v. Ogden, 9 Wheat., on page 229, 6 L. Ed. 23:

"Commerce, in its simplest signification, means an exchange of goods; but, in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange, become commodities, and enter into commerce. The subject, the vehicle, the agent, and their various operations, become the objects of commercial regulations."

In Cooley v. Port Wardens, 12 How. 299, 13 L. Ed. 996, the court, in holding that the regulation of pilots is regulation of commerce within the meaning of the commerce clause, says:

"It extends to the persons who conduct it, as well as to the instruments used."

Mr. Justice Field, in Sherlock v. Alling, 93 U. S. 99, 23 L. Ed. 819, delivering the opinion of the court, says:

"It is true that the commercial power conferred by the Constitution is one without limitation. It authorizes legislation with respect to all the subjects of foreign and interstate commerce, the persons engaged in it, and the instruments by which it is carried on."

Mr. Justice Field, in the case of Gloucester Ferry Company v. Pennsylvania, 114 U. S., on page 203, 5 Sup. Ct., on page 828, 29 L. Ed. 158, in delivering the unanimous opinion of the Supreme Court, says:

"The means of transportation of persons and freight between the states does not change the character of the business as one of commerce, nor does the time within which the distance between the states may be traversed. Commerce between the states consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale, and exchange of commodities. The power to regulate that commerce, as well as commerce with foreign nations, vested in Congress, is the power to prescribe the rules by which it shall be governed—that is, the conditions upon which it shall be conducted—to determine when it shall be free and when subject to duties and other exactions. The power also embraces within its control all instrumentalities by which that commerce may be carried on, and the means by which it may be aided and encouraged."

164 F.—23

Again, says Mr. Justice Harlan, in affirming the decree of the lower court in the case of Northern Securities Company v. United States, 193 U. S. 350, 24 Sup. Ct. 462, 48 L. Ed. 679:

· "Whilst every instrumentality of domestic commerce is subject to state control, every instrumentality of interstate commerce may be reached and controlled by national authority, so far as to compel it to respect the rules for such commerce lawfully established by Congress."

From the decisions to which I have just referred, it is plain that it has been decided in no uncertain terms that Congress has a right not only to regulate individuals or corporations engaged in interstate commerce, but the instrumentalities of such commerce as well. This being settled by the courts, thus it follows that the "instrumentalities" are as much a part of commerce as the business thereof, and the power of Congress to regulate the one is as full and complete as its power to regulate the other The engine engaged in interstate commerce is an instrumentality of that commerce and may be regulated by Congress. The cars, and the rails upon which the cars are run, are all instrumentalities of commerce. The highway upon which the cross-ties and the rails rest, when this highway with its cross-ties and rails runs from one state to another, is an instrumentality of commerce, falling within the purview of the Constitution, which confers upon Congress the right to regulate interstate commerce. From what has been said above, and the authorities cited, it is plain, therefore, that Congress, in regulating those instrumentalities of commerce, to wit, "trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce," was acting entirely within the scope of its authority conferred by the Constitution; and the first four grounds of the demurrer are, therefore, not well taken.

I now come to the fifth ground of the demurrer, to wit, that the acts of Congress in question are violative of the tenth amendment to the Constitution of the United States, which amendment is as follows:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

The argument in support of this ground of demurrer is that the attempt of Congress to regulate the interstate highway in the manner set forth in the safety appliance acts is an unconstitutional assumption by Congress of those powers which were reserved to the various states of the Union or to the people; that inasmuch as any proper construction of those acts must, of necessity, include the use of the highway for the purpose of carrying on commerce between two points entirely within a state, this is an encroachment upon the reserved powers of the states to regulate their internal affairs, and was not conferred upon Congress by the Constitution. This question—that is, the dividing line between state and federal control—has been, and I presume always will remain, a question of great importance, and it has received the thought and consideration of jurists and scholars since the foundation of our government. I shall not attempt to review the many arguments and judicial decisions which have had reference to this great question, but shall content myself by stating suc-

cinctly my reasons for reaching my conclusion upon this ground of the demurrer. This conclusion is based upon what I conceive to be the fundamental policy of this government, as determined not alone by its legislation, but by the decisions of the Supreme Court. To determine the question whether the particular power which is here challenged has been reserved to the state or granted to the general government by the people in their Constitution depends upon a fair construction of the Constitution as a whole, including the amendments.

The United States is a nation, and its Constitution is the organic fundamental law of that nation. The people of this nation existed as a people prior to the adoption of the Constitution, and hence, in primis these people were not called into being as a consequence of that instrument alone. The people collectively existed as a political unit. Prior to the adoption of the Constitution, the states, as states, did not exist as separate states, regarding themselves simply as distinct organized governments. The peoples of those states, prior to the adoption of the Constitution, were not separate, independent, sovereign aggregates or communities. They did not assemble in the Convention which framed the Constitution as representatives of independent nations or sovereignties. The Constitution, therefore, was the work of the people of the United States as a whole. It is true that they did not vote together as a solid mass of electors, but they were acting in their respective commonwealths for reasons of policy and convenience. As a necessary consequence of this view the powers of the general government cannot be said to have been delegated to it by the several states in the light of organized governments, nor by the peoples of those several states, regarding those people as separate and independent sovereign aggregates or communities. The powers held by the general government were, therefore, necessarily delegated to it by the people of the United States as a whole, abstracted from their local relations to the various commonwealths of which they were also members. Now, let us carefully note the reading of the amendment under discussion, and determine, if we can, by whom were the powers not delegated by the people of the United States to the general government reserved. Were they reserved by the several states to themselves? Surely this construction cannot be correct; for, if these states were not independent nations or sovereignties before the Constitution was adopted, they could not grant any powers, and hence they could not reserve any. As is said by Pomeroy in his work on Constitutional Law, speaking of the powers granted to the general government, as well as those reserved to the states:

"The powers not thus granted by the people of the United States to its general government were not reserved by the several states to themselves; for, as these states as such did not grant any powers, they could not reserve any. But they were reserved by the people of the United States to themselves, or to the several states. Thus the people of the United States, as a nation, is the ultimate source of all power, both that conferred upon the general government, that conferred upon each state as a separate political society, and that retained by themselves."

The same reservation as is here under discussion was contained in the second article of the Articles of Confederation, except that the

word "expressly" was there placed before the word "delegated." The omission of this word in the tenth amendment is most significant, and shows the object was not to interfere with or restrict any of the powers delegated to the United States by the Constitution, whether expressly delegated or not. Metropolitan National Bank v. Van Dyck, 27 N. Y. 416. I do not pretend to say that the construction placed upon the Constitution and the national character of the government of the United States here suggested has been at all times the fixed rule of construction in relation thereto by the Supreme Court of the United States and other courts of this country to such an extent that it may be deemed the settled rule of construction; but what I mean to say is that from this theory of the national character of our government and of the source of the powers granted to Congress under the Constitution have been evolved those various decisions of the Supreme Court of the United States and the other courts which have held that Congress has the power to go beyond the general regulations of commerce which it is accustomed to establish, to descend to the most minute directions if it shall be deemed advisable, and to whatever extent ground shall be covered by those directions the exercise of state power is precluded. As said by Judge Cooley in his work on Constitutional Limitations (7th Ed.), on page 856:

"Congress may establish police regulations, as well as the states, confining their operation to the subject over which it is given control by the Constitution."

It must not be understood that I am contending that Congress has the supreme power under the Constitution, or as a police regulation, to regulate the internal affairs of the states, or that the states cannot, under their police powers, enact laws for the orderly administration of state matters, and which may incidentally affect interstate commerce. The comprehensive statement of Mr. Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat., at page 194, 6 L. Ed. 23, has always been accepted by the Supreme Court as the proper statement of what matters of state control are not embraced in the grant of authority to Congress to regulate commerce. In that case it is said:

"It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. Such a power would be inconvenient and is certainly unnecessary. Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more states than one. * * * The genius and character of the whole government seem to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally, but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government."

The great interstate railroad highways of this country in a large number of cases have been made possible of success only by the expenditure of millions of dollars contributed by all of the people from the national treasury. Thousands of miles of these great highways are to-day located and built upon the public domain, generously granted by the sovereign people, through their representatives in Con-

gress, for the benefit and use of commerce between the states. That strictly national and exclusive governmental function, of carrying the mails is exercised by means of these great highways. It will thus be seen that by the very nature of things railroads between states are national in their character, and, when Congress determines to assume regulation thereof, its control must be, and is, exclusive and final. If Congress, therefore, under the power granted by the Constitution and under its police power, has a right to regulate the use of the interstate highway, surely that right cannot be impaired by any action of a state in conflict with the rules and regulations established by Congress. Uniformity of regulation affecting all the states is not only permissible, but is required. There must be only one system of rules applicable alike to the whole country, which Congress alone can prescribe. Mobile County v. Kimball, 102 U. S. 691, 26 L. Ed. 238. Interminable discord must of necessity prevail under our dual system of government if the power of Congress, once assumed, and the regulations prescribed by it, can be invaded by each and every state through which the great interstate highway runs. Within the field of congressional power, authorized by the Constitution of the United States, the federal power, to be effective at all, must be supreme in all parts of the United States. This declaration of supremacy as vouchsafed to the federal government is expressed in article 6, par. 2, of the Constitution of the United States, in the following words:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

What is the meaning of this declaration? They are surely not the idle and thoughtless words of a thoughtless people, but they are the deliberate sentiments of a sovereign people, who were building a temple within which their liberties were to be enshrined for all time. It means that so far as the people of the United States, the nation, have seen fit to delegate a portion of their own inherent powers of legislation and government to their appointed rulers, just so far those appointed rulers are supreme throughout the land in the exercise of those delegated powers. As is well stated by Mr. Chief Justice Waite in the case of Pensacola Telegraph Company v. Western Union Telegraph Company, 96 U. S. 1, 24 L. Ed. 708:

"The Constitution of the United States and the laws made in pursuance thereof are the supreme law of the land. Article 6, par. 2. A law of Congress made in pursuance of the Constitution suspends or overrides all state statutes with which it is in conflict."

Congress has chosen to act, and its action necessarily precludes the action of the state. Pennsylvania v. Wheeling, etc., Company, 18 How. 421, 15 L. Ed. 435.

From what has been stated above, and the authorities cited it is plain that the demurrer to those counts which aver that the cars were loaded with commodities consigned from a point within the state to another point within this same state is not well taken. They were hauled over a portion of an interstate highway and by a common car-

rier engaged in interstate commerce. Congress has said that no vehicles shall be used on this interstate highway which are in the condition alleged in the petition. Whether this interstate highway is used in the hauling of vehicles in the condition alleged in the petition from a point in one state to a point in another state or between points entirely within the same state, is immaterial in the application of the safety appliance statutes.

The demurrer, and each and every ground thereof, is overruled.

It is so ordered.