## SOUTHERN RY. CO. v. SNYDER.

(Circuit Court of Appeals, Sixth Circuit. May 3, 1911.)

No. 2,055.

**1. MASTER AND SERVANT (§ 111*)—SAFETY APPLIANCE ACT—CONSTRUCTION.**

The object of Safety Appliance Act March 2, 1893, c. 196, § 2, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174) and its amendments being remedial and humanitarian in its purpose, to protect the lives and limbs of railroad employés by making it unnecessary for men operating the couplers to go between the ends of the cars, the act is not to be construed so narrowly as to defeat such purpose.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 215; Dec. Dig. § 111.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

**2. COMMERCE (§ 27*)—RAILROADS—SAFETY APPLIANCE ACT—CONSTRUCTION—EQUIPMENT OF CARS.**

The cars of an interstate railroad, which are generally used interchangeably and indiscriminately in both interstate and intrastate traffic, are subject to Safety Appliance Act March 2, 1893, c. 196, § 2, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), as amended by Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1144), while employed commercially and in such indiscriminate and interchangeable use, but not while actually devoted to purely intrastate use, even though not set apart solely and specifically for such use.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*]

**3. COMMERCE (§ 58*)—SAFETY APPLIANCE ACT—CONSTITUTIONALITY.**

Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), as amended by Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1143), as so construed, is constitutional.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 58.*]

**4. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—VIOLATION.**

While a railroad may move empty cars by themselves to repair shops for the purpose of having them placed in condition to comply with the safety appliance acts (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], and Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1909, p. 1143]), without being guilty of a violation of those acts, yet in so moving them for the purpose of repair, in order not to be subject to the acts, they must be wholly excluded from commercial use themselves, and from connection with other vehicles which are commercially employed.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

**5. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—CONSTRUCTION—EQUIPMENT OF CARS.**

Cars being hauled to a place of repair in a purely intrastate train, composed only of such cars, or while on a repair track out of all connection with vehicles in commercial use, are not subject to Safety Appliance Act March 2, 1893, c. 196, § 2, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), as amended by Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1144).

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

**6. MASTER AND SERVANT (§ 111*)—SAFETY APPLIANCE ACT—DEFECTIVE COUPLING—INJURY TO SWITCHMAN.**

Where a yard employé was injured in coupling cars on a transfer track, from one of which the drawhead was gone, the fact that such car had

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

been left to be taken to a repair shop, and was not then in commercial use, nor actually connected with any car in such use, and could have been taken from the track without such connection, is not conclusive that it was not subject to the safety appliance acts (Act March 2, 1893, c. 196, § 2, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], and Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1909, p. 1144]), if it would naturally be so connected in the usual course of switching.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 111.*]

In Error to the Circuit Court of the United States for the Eastern District of Tennessee.

Action at law by D. S. Snyder against the Southern Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

The defendant in error (plaintiff below) recovered verdict and judgment against plaintiff in error (defendant below) for damages for the loss of an arm, incurred by plaintiff while engaged as yard conductor in coupling cars in the west part of defendant's "K. & O. yards," so-called, near Knoxville, Tenn. The ground on which recovery was permitted was that the coupling device on the car in question was so out of repair as to make it necessary for one to go between the cars for purposes of coupling and uncoupling, in alleged violation of the federal safety appliance act; a count charging common-law negligence having been withdrawn from the consideration of the jury. The testimony, which for the most part was undisputed, showed this state of facts:

The defendant is an interstate carrier by railroad, operating in Tennessee, North Carolina, and other states. During the period in which the plaintiff was hurt defendant did not classify its freight cars, but used them indiscriminately in interstate and intrastate traffic. The car in question—Southern Railway box car No. 14456—was hauled empty from Yalu, Tenn., to defendant's "Coster yards," about two miles north of Knoxville, on September 17, 1907, as part of defendant's freight train which ran from Asheville, N. C., to Knoxville, Tenn. The ultimate destination of the car does not appear, except to the extent possibly inferable from its next movement after its repair, viz., that it left Knoxville, loaded, on October 20th or 21st, on a freight train operating between Knoxville, Tenn., and Asheville, N. C. The car was inspected on the day of its arrival at the Coster yards, and the coupler or drawhead found to be gone. The restoring of the coupler was a "light repair." These Coster yards had extensive shops, employing at least 1,000 men. Some repairs, especially light repairs, were also done there outside the shops; at least 50 repairmen being employed in the yards. No "bad order" card was put on the car, but it may have been marked as needing repairs. It remained in this condition on the storage tracks in the Coster yards until October 12th (a period of 25 days), when it was started for Lenoir City, Tenn., about 25 miles from Knoxville, for repair by a private company at that place, in accordance with defendant's custom to bunch in the Coster yards for such destination cars requiring "heavy repairs," "when sills were gone from under the cars and things of that kind," until a train load should accumulate. There is a conflict in the testimony as to whether the cars were sent in a train made up wholly of bad order cars destined for Lenoir City, or whether they were put in a regular train running to Chattanooga and Cleveland. After starting on this trip to Lenoir City, the car came into the K. & O. yards (about three miles from the Coster yards) "chained up and next to the engine." The car inspector there ordered the car out of the train for repair in the K. & O. yards, for the reason that only light repairs were needed; 12 to 15 repairmen being kept in these yards. It was placed with 7 or 8 other cars, some loaded and some empty, on the east end of track No. 5, which was a transfer track connected with a repair track, and was marked to be taken out for repairs. On the west end of the transfer track were

other cars, some loaded and some empty, marked for switching according to their destinations, which, there was testimony tending to show, were both within and without the state. It does not appear whether any of the cars on the east end of the transfer track, which had to be moved in switching out the Southern car, were at the time actually engaged in interstate traffic. At the K. & O. yards were 11 switch tracks; two (Nos. 5 and 6) being transfer tracks, the others being used for storage of cars and sometimes of trains, cars being switched from these tracks to the Coster yards, where trains were made up for points both within and without the state, trains for the Chattanooga division of the Southern Railway leaving from the K. & O. yards. While plaintiff and one of his crew were attempting to fasten the chain on the end of the Southern car to the coupler of the car next to it, and toward the engine, by means of a pin through the coupler of the latter car, for the purpose of setting the Southern car off the transfer track for placing it on the repair track, plaintiff's hand was caught and crushed between the draft timbers of the Southern car and the drawhead of the adjoining car, by reason of another switching train coming into collision with the cars on the transfer track to the west of where plaintiff was working.

At the close of the evidence defendant moved for peremptory instruction in its favor, which was denied; error being assigned upon this refusal. The jury were instructed that if the Southern car in question was "a car which was generally and ordinarily used in interstate traffic, or in connection with cars or equipment used in interstate traffic by the Southern Railway, then it was a car coming within the terms of the statute; and this would be shown by proof satisfying you by a preponderance of the evidence that this car was used interchangeably for local and interstate traffic. If it was a car used interchangeably for those two purposes, it would be a car used in interstate traffic within the law that I have stated. In order that a car might not be subject to the safety appliance act, as one not used in interstate traffic, it would have to be a car which the railroad had set apart solely and specifically for use in local traffic; that is, for traffic within the state, to be used for that purpose alone, and not for the purpose of moving interstate traffic, or of being generally or ordinarily used in connection with the movement of interstate traffic." The jury was instructed, however, that if the car "had been withdrawn from general use, and was being moved to the nearest repair shop in the exercise of the utmost diligence after the defect was discovered or could have been discovered, then it would not be subject to the act"; but that if the "defect was discovered, or could have been discovered at the Coster yards, and * * * could have been repaired with due diligence at the Coster yards, and * * * was moved from the Coster yards and started on this trip to Lenoir City, and put into use that way, that then it became subject to the safety appliance statutes."

Error is assigned upon the instructions referred to, as well as upon the refusal of the court to instruct, in effect, that the car was not subject to the safety appliance statute, and plaintiff not relieved from the assumption of risk, provided its movement from the transfer track to the repair track was necessary in taking it out of service for the purpose of repairing it; that the fact that the railroad company had previously failed to put the car out of service, when it might have been done with due diligence, would not bring the movement of the car under the safety appliance act and relieve the plaintiff of the assumption of risk; that the movement of the car from the Coster yards to the repair shops at Lenoir City, for the purpose of having it put in repair and equipped in accordance with the requirements of the safety appliance statute, did not violate that statute, provided defendant did not, in connection with such movement, also move in interstate commerce other cars or commerce; and that if plaintiff could reasonably have placed the car "on the repair track, without connecting the car with or moving it in connection with other cars commercially employed, it was his duty to do so, and if he failed to do so, and was injured thereby, he cannot complain, nor be relieved of the assumption of risks incident thereto." The constitutionality of the amendment of 1903 to the safety appliance act, as construed by the court, was also challenged by appropriate exceptions and assignments.

L. D. Smith, Leon Jourolmon, and W. L. Welcker, for plaintiff in error.

G. W. Pickle, W. R. Turner, and W. T. Kennerly, for defendant in error.

Before SEVERENS, WARRINGTON, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge (after stating the facts as above). The record presents the question whether the federal safety appliance statutes (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], and Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1909, p. 1144]) apply to all cars of an interstate carrier by railroad which makes no classification of its cars between interstate and intrastate traffic, but uses such cars without discrimination and interchangeably in both classes of traffic, and without reference to whether a car is or is not, at the time of the alleged violation, actually engaged in or used in connection with an interstate movement of traffic, and whether the act, if construed to so apply, is constitutional.

The question now presented has been passed upon in but few cases. The nearest approach to a decision of the question which has been made by the Supreme Court is found in Johnson v. Southern Pacific Ry. Co., 196 U. S. 1, 22, 25 Sup. Ct. 158, 49 L. Ed. 363, where it was held that a dining car regularly engaged in interstate traffic does not cease to be so engaged when waiting for a train to make the next or return trip; the court saying (through Chief Justice Fuller):

"It (the car) was being regularly used in the movement of interstate traffic and so within the law."

The dining car in question in the Johnson Case had, in fact, been used only in interstate business, and was awaiting its return trip.

[1] It is well settled that, the object of the safety appliance act being remedial and humanitarian in its purpose, to protect the lives and limbs of railroad employés by making it unnecessary for men operating the couplers to go between the ends of the cars, the act is not to be construed so narrowly as to defeat the obvious intention of the Legislature. Johnson v. Southern Pacific Ry. Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363; Schlemmer v. Buffalo, etc., Ry. Co., 205 U. S. 1, 27 Sup. Ct. 407, 51 L. Ed. 681; United States v. Illinois Central R. R. Co. (6th Circuit), 177 Fed. 801, 101 C. C. A. 15. It is the generally recognized construction of the act that the mere fact that a car is not itself engaged in the movement of interstate commerce does not take it out of the operation of the safety appliance act. It is so subject if part of a train of cars containing interstate traffic (Louisville & Nashville R. R. Co. v. United States, 186 Fed. 280, decided by this court February 7, 1911; Norfolk & Western Ry. Co. v. United States [4th Circuit] 177 Fed. 623, 101 C. C. A. 249); and this is so even if the car is itself empty (Schlemmer v. Buffalo, etc., Ry. Co., supra; Chicago, M. & St. P. Ry. Co. v. United States [8th Circuit] 165 Fed. 423, 91 C. C. A. 373, 20 L. R. A. [N. S.] 473; United States v. St. Louis, I. M. & S. R. Co. [D. C.] 154 Fed. 516); and even although

the train is running only between points in the same state, provided interstate traffic is carried by the train (United States v. International & G. N. R. Co. [5th Circuit] 174 Fed. 638, 98 C. C. A. 392; United States v. Wheeling & L. E. R. Co. [D. C.] 167 Fed. 198); and even though being hauled to a repair shop (Chicago, M. & St. P. Ry. Co. v. United States, supra; United States v. St. Louis, I. M. & S. R. Co., supra).

In Wabash R. R. Co. v. United States, 168 Fed. 1, 93 C. C. A. 393, the Circuit Court of Appeals for the Seventh Circuit held that a car belonging to a railroad engaged in interstate commerce, and which car is customarily and generally employed in moving interstate traffic, is subject to the federal safety appliance act. This holding was made in a case heard upon demurrer, the effect of which was to admit that:

"The defective car was not part of an interstate train, was not itself being moved on an interstate journey, and was not exclusively devoted to the carriage of commodities in interstate traffic."

Judge Seaman dissented from the judgment of the court, upon the ground that the statute so construed would be unconstitutional. Several decisions have been made by District Courts recognizing the proposition asserted in Wabash Ry. Co. v. United States, supra, although in some at least of these cases the proposition decided in the Wabash Case seems not to have been necessary to the decision actually made. See United States v. Great Northern Ry. Co. (D. C.) 145 Fed. 438; Kelly v. Great Northern Ry. Co. (C. C.) 152 Fed. 211; United States v. Chicago & N. W. Ry. Co. (D. C.) 157 Fed. 616; United States v. Southern Ry. Co. (D. C.) 164 Fed. 347; Hohenleitner v. Southern Pacific R. R. Co. (C. C.) 177 Fed. 796; United States v. St. Louis, I. M. & S. R. Co. (D. C.) 154 Fed. 516.

[2] Considering the language of the act, its purpose, and the liberality with which it has been construed, we are constrained to hold, subject to the limitations hereafter stated, that the cars of an interstate railroad, which are generally used interchangeably and indiscriminately in both interstate and intrastate traffic, are subject to the act while employed commercially and in such indiscriminate and interchangeable use. A carrier cannot lawfully use a car interchangeably in interstate and intrastate traffic without first equipping it in accordance with the federal act. The duty of original equipment becomes fixed by its actual application to such interchangeable use; and employés required to handle such cars in the dangerous work of coupling and uncoupling with knowledge of such interchangeable and indiscriminate use should not, on finding a car originally equipped according to the act, and not either devoted at the time to purely intrastate use or withdrawn from commercial use, be required to determine whether to use such car with such defective equipment at the peril of assuming the risk incident thereto, or to decline to do so at the risk of losing their employment.

[3] But we think that the cars of an interstate railroad, although generally used interchangeably and indiscriminately in both intrastate and interstate traffic, are not subject to the act while actually devoted

to purely intrastate use, even though not set apart solely and specifically for such use. The act so construed is not, in our opinion, unconstitutional. It does not attempt to regulate all the business and concerns of a railroad merely because it engages in interstate commerce, but regulates those concerns only because they relate to interstate commerce. We think the conclusion we have reached in this regard does not conflict with the decision of the Supreme Court in the Employer's Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297. See, also, Louisville & N. Ry. Co. v. United States, recently decided by this court, and before referred to, where the constitutionality of the safety appliance act as there construed is discussed. The instructions given by the trial judge, so far as in conflict with the views we have expressed regarding the construction of the act, are, in our opinion, erroneous.

We also think the trial judge erred in making the subjection of the car to the act depend, not upon the commercial use of the car or upon its use in connection with vehicles themselves in commercial use, in switchyards or elsewhere, but solely because used at all on the road, even if wholly withdrawn from commercial use. The learned judge seems to have treated the car as in use, within the meaning of the act. if unnecessarily and improperly removed from the Coster yards for the purpose of repair. Assuming that the car was generally subject to the safety appliance act, it is clear that it was defendant's duty to exercise a high degree of diligence in discovering and repairing the defect in the coupler, and in withdrawing the car from commercial use while such defect existed.

[4] While a carrier may move empty cars by themselves to repair shops for the purpose of having them placed in condition to comply with the safety appliance acts, without being guilty of a violation of those acts while engaged in an honest effort to meet their requirements, yet the cars, in any movement for the purpose of repairing them after they so become defective, must. in order not to be subject to the act, be wholly excluded from commercial use themselves and from other vehicles which are commercially employed. St. Louis & S. F. R. Co. v. Delk, 158 Fed. 931, 86 C. C. A. 95; United States v. Southern Pacific Ry. Co., 169 Fed. 407, 409, 94 C. C. A. 629; Chicago Junction Ry. Co. v. King (7th Circuit), 169 Fed. 372, 94 C. C. A. 652.

[5] But we think that, notwithstanding the defendant did not seasonably repair the defect in the car, the latter was not subject to the act while actually withdrawn from commercial use and from connection with vehicles in commercial use—for example, while being hauled to Lenoir in a purely intrastate train, composed only of cars carried for purpose of repair, or while retained on a repair track out of all connection with vehicles in commercial use. On the other hand, it would be subject to the act while being hauled, even for such purpose, in a train of an interstate nature, as a regular freight train to Chattanooga and Cleveland may have been (Chicago & N. W. R. Co. v. United States [8th Circuit], 168 Fed. 236, 93 C. C. A. 450, 21 L. R. A. [N. S.] 690; United States v. R. G. Western R. Co. [8th Circuit], 174 Fed. 399, 98 C. C. A. 293; St. Louis & S. F. R. Co. v. Delk [6th Cir-

187 F.—32

cuit] supra), or even while on a transfer track, if in connection with vehicles commercially employed.

But the court did not, in our opinion, err in refusing to instruct a verdict for defendant. Plaintiff's declaration alleges that the cars between which plaintiff was caught and injured "were in use, and had been in common and regular use, upon the lines of road of the defendant engaged in moving and transporting interstate commerce and traffic, and that they were at the time of said accident being used in connection with other cars of the defendant in the making up and distribution of trains for the purpose of transporting and moving interstate commerce and traffic over the defendant's said line of railroad." The car in question is thus, in substance, alleged to have been itself actually engaged at the time in interstate traffic, and to have been in use at the time in connection with vehicles so engaged.

Although the injury did not occur while the car was in a train bound for Lenoir City, but while employed in switching and transfer operations, there was testimony tending to show that it had not been withdrawn from connection with cars commercially employed. Unless so withdrawn, the car, if otherwise subject to the act, would not be relieved therefrom by its own withdrawal from commercial use. There was also testimony tending to show that the car in question was at the time of the accident employed in connection with cars engaged in interstate traffic, and thus made subject to the act, even if not itself a car engaged in such interstate commerce. The testimony tended to show that the car was, through the fault of the defendant, placed on the transfer track in question; that this track was used without discrimination for both state and interstate traffic in connection with the making up and unmaking of trains; that on this track at the time were cars employed in commerce generally, as well as cars actually engaged in interstate commerce, whose movement in fact precipitated the collision and consequent injury to plaintiff.

[6] One of the prominent objects of the federal safety appliance acts is the protection of railroad employés in the making up and unmaking of trains, and of sorting cars in connection therewith. Chicago, M. & St. P. Ry. Co. v. Voelker, 129 Fed. 522, 65 C. C. A. 226, 70 L. R. A. 264; Wabash Ry. Co. v. United States, supra; St. Louis & S. F. R. Co. v. Delk, supra. The fact that the car in question could have been, and was about to be, taken from the transfer track without being connected with or without the movement of the cars on the west end of the track, is not, to our minds, necessarily controlling of the question whether the car was withdrawn from use in connection with cars commercially engaged, or from use in connection with cars engaged in interstate commerce. If the cars then and there in commercial use were subject to be directly connected with the car in question, in the natural and regular course of switching operations, the connection contemplated by the statute may have existed, notwithstanding the car was not actually connected up with any cars at the time in commercial use. Again, if the cars to the east of the car in question, and to which it was being connected, were themselves in commercial use, the car in question would still be subject to the act.

For the error in the instruction to the jury which we have pointed out, the judgment should be reversed, and a new trial ordered. We think the views we have expressed sufficiently indicate our opinion upon the questions raised by the specific errors assigned.