DENVER & R: G. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. February 18, 1918.)

Nos. 4861, 4862.

1. RAILROADS ⊕229—OPERATION—SAFETY APPLIANCE ACTS—MOVEMENT OF DEFECTIVE CARS.

Under the proviso of Act April 14, 1910, c. 160, § 4, 36 Stat. 299 (Comp. St. 1916, § 8621), declaring that, where any car which shall have been properly equipped as required shall become defective or insecure while being used, such car may be hauled from the place where the equipment was first discovered to be defective to the nearest available point where such car can be repaired without liability for the penalties imposed, the movement of a car discovered to be defective while in transit is restricted to what is necessary for the repair, and, if the defect can be repaired at the point of discovery, it cannot be moved at all without liability on the part of the railroad company.

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. RAILROADS ⬤═229—OPERATION—SAFETY APPLIANCE ACT—MOVEMENT OF DEFECTIVE CARS.

Likewise a car discovered to be defective cannot, under the proviso, be hauled or handled for any purpose other than repair, and may not be handled for the purpose of delivering its load to the consignee, even when unloading is necessary for its repair, unless it be affirmatively shown that such delivery involves no more movement or handling of the car than in unloading or transferring its load; hence it cannot be assumed, defective cars having been used for making deliveries, that there was no more handling than would have been required in their transportation to repair points.

3. RAILROADS ⬤═254(6)—OPERATION—MOVEMENT OF DEFECTIVE CARS—PRESUMPTION.

Where loaded cars, which were discovered to be defective while in transit and had to be moved to be repaired, were also used for the purpose of transporting their contents to the consignees, the vague presumption that every one does his duty is not sufficient to make an affirmative showing that deliveries involved no more handling of the cars than unloading or transferring their loads, and so was permissible under Act April 14, 1910, § 4.

4. RAILROADS ⬤═254(6)—OPERATION—MOVEMENT OF DEFECTIVE CARS—STATUTE.

Under such act, when a car is hauled past the nearest repair point at which a supply of men and materials is kept adequate for making the repairs required, this justifies the holding that the law is violated unless there is a showing of a special reason for the movement, and it is not a sufficient explanation that main line and foreign line cars were repaired only at the terminals of the railroad company, and not at intermediate points where repair shops for branch line cars were maintained.

5. RAILROADS ⬤═229—OPERATION—DEFECTIVE CARS—"REVENUE TRAIN"—"COMMERCIALLY USED."

Under the proviso of Act April 14, 1910, § 4, allowing cars, the equipment of which has become defective while being used, to be hauled to the nearest available point for repair, but providing that nothing shall be construed to permit the hauling of defective cars by means of chains instead of drawbars in revenue trains, or in association with other cars that are commercially used, unless such defective cars contain live stock or perishable freight, a train is a "revenue train" when it is moved for the purpose of transporting traffic for revenue, and cars are "commercially used," either when they are moving traffic, or when, though empty, they are moving to points for the purpose of receiving traffic; therefore it is a violation of the act for a railroad company to operate chained cars in a train made up of other defective cars, which cars, however, were used for making deliveries and were set out at various points, this being particularly true as the train, though called a hospital train, was composed of many cars.

In Error to the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

Two actions by the United States against the Denver & Rio Grande Railroad Company, which were tried together on an agreed statement of facts. There were judgments for plaintiff, and defendant brings error. Affirmed.

E. N. Clark, of Denver, Colo. (Waldemar Van Cott, E. M. Allison, Jr., and William D. Riter, all of Salt Lake City, Utah, on the brief), for plaintiff in error.

Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C. (Wil-

liam W. Ray, U. S. Atty., of Salt Lake City, Utah, on the brief), for the United States.

Before CARLAND, Circuit Judge, and AMIDON and MUNGER, District Judges.

AMIDON, District Judge. These are two civil actions brought by the United States against the Denver & Rio Grande Railroad Company to recover penalties for alleged violations of the Safety Appliance Act. They were tried together in the District Court upon an agreed statement of facts, resulting in judgments in favor of the government. The railroad company brings error.

Case No. 4861 involves the hauling between the stations of Helper and Salt Lake City of 11 cars that were coupled by means of chains, instead of drawbars. Case No. 4862 involved the hauling of 5 cars similarly defective.

The trains were what is known as "hospital trains." They were composed entirely of cars so defective as to make them unfit to be handled in ordinary freight trains until they were repaired. These trains were moved only in the daytime, and were in charge of special crews under special officers to see that they were carefully handled. They had on board a force of repair men for the purpose of making any temporary repairs that should become necessary for their movement in their defective condition. They picked up cars and set out cars at numerous stations along the line. The stations at which cars were set out were of two classes: First, the station for which the cargo was destined; second, when the cargo was destined for a station on a branch line the cars were set out at the terminus of that branch to be later hauled to the station for which they were destined. When the train involved in case 4861 started from Helper, it consisted of a caboose, 10 empties, and 1 loaded car. In the course of its journey it picked up at way stations 93 cars, set out 35 cars, and arrived at Salt Lake City with 58 cars. With the exception of 31 empties, all the cars handled in the train were loaded and proceeding in the direction of their final destination. The other train involved a similar state of facts, though the number of cars moved was not so numerous. The company kept a force of car repairers and equipment at the intermediate stations at Helper, Thistle, Provo, and Midvale; but its shops, with extensive facilities for making repairs, were maintained at the terminal at Salt Lake City. The intermediate points just mentioned were stations on the main line from which branch lines extended, and the repairs made at those points were chiefly confined to defects arising upon the branch lines. Foreign cars, and cars of the company becoming defective on the main line, were taken to such important repair points as Salt Lake City for repair. The company received pay for the loaded cars in these hospital trains, the same as if they had been moved in ordinary freight trains. It is also true, and that these cars could not be repaired until they had first been unloaded.

The answer of the carrier, and the recitals in the agreed statement, admit all the allegations in the complaints. The defense rests

entirely upon the claim made in the answer that each hauling of the cars involved was for the purpose of repair; the defendant claiming that the particular circumstances set forth in the statement of facts furnished a justification for the movements in question under the proviso of section 4 of the Act of April 14, 1910. The proviso reads as follows:

"Provided, that where any car shall have been properly equipped, as provided in this act and the other acts mentioned herein, and such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired, without liability for the penalties imposed by section four of this act or section six of the act of March second, eighteen hundred and ninety-three as amended by the act of April first, eighteen hundred and ninety-six, if such movement is necessary to make such repairs and such repairs can not be made except at such repair point; * * * and nothing in this proviso shall be construed to permit the hauling of defective cars by means of chains instead of drawbars, in revenue trains or in association with other cars that are commercially used, unless such defective cars contain live stock or 'perishable' freight."

The movement of a defective car is restricted by this proviso—

[1] 1. To what is "necessary" for its repair. If it can be repaired where the defect is discovered, it cannot be moved at all in its defective condition. If the defect is such that it must be moved to repair it, the movement is restricted to what is necessary for the repair.

[2, 3] 2. To hauling it from the point where the defect is first discovered to the nearest available point of repair. This and the first restriction, taken together, forbid every hauling or handling of the car for any other purpose than repair. It may not be handled for the purpose of delivering its load to the consignee, even when unloading is necessary for its repair, unless it be affirmatively shown that such delivery involves no more movement or handling of the car than unloading it or transferring its load. That affirmative showing cannot be made by the vague presumption that every one does his duty. It calls for positive proof. The defendant made no such showing. It insists that as the cars had to be unloaded before they could be repaired, every movement for unloading them is justified by the ultimate purpose to repair. That is the capital vice of the defense. The cars were loaded with coal. The coal could have been placed in bins or transferred to other cars. We cannot say without proof that this operation, even when the delivery was on the main line, would involve as much handling of the car as its delivery to the consignee; and it is entirely plain that such would not be the case when the delivery was on a branch line, for that would involve a double switching and a complete diversion of the car from the nearest available point of repair.

[4] Again, main line and foreign cars were carried past several intermediate repair points to the terminal at Salt Lake City. This called for explanation. The only explanation given was that the company was accustomed to repair main line and foreign cars only at the terminals at Denver and Salt Lake City, points separated by a distance

of 745 miles, and to repair only branch line cars at intermediate points. The explanation is insufficient to meet the requirements of the law. The great distance between the terminals made intermediate points of repair necessary. The statement of facts shows that a supply of men and materials was kept at the intermediate points adequate to make heavy repairs such as the cars here required. When defective cars are hauled past such a point, "the nearest available point of repair" clause of the proviso demands something more than the habits or convenience of the carrier to justify the act. It must be shown by affirmative proof that the facilities at the intermediate point are not "available" and that the movement is "necessary." In the absence of such proof the act is "unlawful" under section 5. We do not lay down any absolute rule which would forbid hauling a defective car past an intermediate repair point. It might be that the congestion of defective cars at that point, or the seriousness of the defect in the car hauled, would be such as to justify the movement. All we say is that, when a car is hauled past the nearest repair point at which a supply of men and materials is kept, adequate for making the repair required, this justifies the holding that the law is violated, unless there is a showing of special reasons for the movement.

[5] 3. Chained cars may not be moved, even for repair, in revenue trains, or in association with cars commercially used, unless the chained cars contain live stock or perishable freight. Here, as always, the exception defines the grant. When is a train a "revenue" train? When are cars "commercially" used? The answer to these questions had been wrought out by the courts before the proviso was adopted, and it is a matter of familiar history that its language was chosen with those decisions in mind. Chicago & N. W. Ry. Co. v. United States, 168 Fed. 236, 93 C. C. A. 450, 21 L. R. A. (N. S.) 690; United States v. Southern Pacific R. R. Co., 169 Fed. 407, 94 C. C. A. 629; Southern Railway Co. v. Snyder, 187 Fed. 492, 109 C. C. A. 344. The answer to our questions cannot be given by calling a train a "hospital" train. The language of the proviso is not borrowed from the medical profession, but from the field of commerce. A train is a revenue train when it is moved for the purpose of transporting traffic for revenue. Cars are commercially used, either when they are moving traffic, or when, though empty, they are moving to points for the purpose of receiving traffic. Chicago, N. W. Ry. Co. v. United States, 168 Fed. 236, 237, 93 C. C. A. 450, 21 L. R. A. (N. S.) 690. Within that definition the trains here involved were revenue trains, and the cars hauled in connection with the chained cars were commercially used. It follows that the hauling of the chained cars was a violation of the law, as they were not loaded with live stock or perishable freight.

What distinction is there between these trains and ordinary freight trains? It is said they were run slowly and in the daytime, and were in charge of special crews. But, if we look to what they did, we find no material difference between them and ordinary freight trains. They were constantly engaged in stopping at stations to pick up cars and at other stations to set out cars. There was the same necessity for switching and coupling and uncoupling. Cars were hauled to their

destination and there switched for the purpose of being unloaded. The trains attained a large size, thus putting a heavy strain upon the couplings, and exposing the trains to the danger of separating while they were in movement. The danger to air hose was greatly increased, and the liability to accident by taking up and running out the slack of chained cars was also enhanced. In fact, every peril was created through the whole length of the journey of these trains which the proviso of the Safety Appliance Act clearly shows a purpose to prevent.

We fully appreciate the traffic advantages from the use of these hospital trains; but those advantages can afford no justification for a violation of the Safety Appliance Act. The soundness of what was said by Judge Adams, speaking for this court, has been amply shown by experience:

"Congress had before it for consideration the important question of promoting the safety of employés and travelers upon railroads, and in the accomplishment of its purpose it may well be that the legislative mind considered the inconvenience and impracticability of a literal compliance at times with the law, and the consequent infliction of the light penalties imposed for its violation to be of little moment compared with the greater importance of protecting life, limb, and property. Drastic measures are frequently necessary to protect and safeguard the rights and interests of the people." United States v. Southern Pacific R. R., 169 Fed. 407, 409, 94 C. C. A. 629, 631.

Straightened is the gate and narrow the way marked out by the proviso for the movement of a defective car. Any departure from that narrow way is made by section 5 of the act unlawful, and subjects the carrier to the penalty of the statute. These restrictions were necessary to prevent the Safety Appliance Law from being destroyed by the privilege granted by the proviso. Congress showed plainly its purpose that this result should not occur, by the reiterated safeguards, negative and affirmative, which it placed around the privilege.

The judgments are affirmed.