## UNITED STATES v. ILLINOIS CENT. R. CO.

(Circuit Court of Appeals, Sixth Circuit. March 27, 1909.)

No. 1,854.

1. PENALTIES (§ 40*)—SAFETY APPLIANCE ACT—VIOLATION—RIGHT TO APPEAL.

An action against an interstate railroad to recover penalties for several violations of Safety Appliance Act March 2, 1893, c. 196, § 6, 27 Stat. 532 (U. S. Comp. St. 1901, p. 3175), providing that each interstate railroad guilty of such violation shall be subject to a penalty of $100, is civil and not criminal in its nature, and hence the United States is entitled to a review on a writ of error.

[Ed. Note.—For other cases, see Penalties, Dec. Dig. § 40.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

2. PENALTIES (§ 40*)—ACTION—APPEAL.

The constitutional prohibition against subjecting a person to be twice put in jeopardy for the same offense does not apply to actions by the United States against an interstate railroad to recover penalties for violation of Safety Appliance Act March 2, 1893, c. 196, § 6, 27 Stat. 532 (U. S. Comp. St. 1901, p. 3175), so as to prevent a review by the government of an adverse decision on a writ of error.

[Ed. Note.—For other cases, see Penalties, Dec. Dig. § 40.*]

3. PENALTIES (§ 33*)—SAFETY APPLIANCE ACT—VIOLATION—ACTION FOR PENALTIES—DEGREE OF PROOF.

An action by the government against an interstate railroad to recover penalties for violation of Safety Appliance Act March 2, 1893, c. 196, § 6, 27 Stat. 532 (U. S. Comp. St. 1901, p. 3175), being civil in its nature, the government is only required to prove its case by a preponderance of the evidence and not beyond reasonable doubt.

[Ed. Note.—For other cases, see Penalties, Cent. Dig. § 34; Dec. Dig. § 33.*]

4. COURTS (§ 96*) — FEDERAL COURTS — DECISIONS OF SUPREME COURT — CONTROLLING AUTHORITY.

While declarations of law bearing on the issues and indicating the proper judgment thereon by the Supreme Court of the United States are binding on the lower federal courts, expressions of opinion as to what the law would be on facts essentially different from those in issue are not controlling.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 327, 328; Dec. Dig. § 96.*]

5. RAILROADS (§ 229*)—EQUIPMENT OF TRAINS—SAFETY APPLIANCE ACTS.

An interstate railroad is guilty of violating Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), if it starts in transit a car containing interstate commerce with a defective coupling which could have been discovered by inspection, but not so, if the car when started had no discoverable defect but developed one in transit, and there was no subsequent lack of diligence either in discovering or repairing the same.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

6. RAILROADS (§ 254*) — SAFETY APPLIANCE ACT — VIOLATION — BURDEN OF PROOF.

Where, in an action against an interstate railroad for violating Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), the government proves that a car laden for interstate traffic and with defective couplings has been hauled on defendant's tracks, the burden is then shifted to defendant to prove exculpatory facts, namely,

that it has used all reasonably possible endeavor to discover and correct the fault.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 254.*]

7. RAILROADS (§ 229*)—EQUIPMENT OF TRAINS—SAFETY APPLIANCE ACTS.
   Safety Appliance Act March 2, 1893, c. 196, § 2, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), requires interstate carriers to equip their cars engaged in interstate commerce with automatic couplers, so that they "can be uncoupled without the necessity of men going between the ends of the cars." *Held*, that the quoted clause is merely descriptive of the equipment required, and does not import that it is the duty of the carrier to keep such equipment in repair at all events.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

8. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—DUTY OF CARRIER.
   Where an interstate carrier has equipped its cars, engines, etc., engaged in interstate commerce with automatic couplers, so that they can be coupled and uncoupled without men going between the ends of the cars, the carrier is then only required to use the utmost diligence in discovering and correcting defects in such equipment which may thereafter develop in the use thereof, and is not liable for violation of the act because of the mere transportation of a car containing a defective coupler, under the maxim that the law does not require an impossibility.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

In Error to the District Court of the United States for the Western District of Kentucky.

George Du Relle and P. J. Doherty, for plaintiff in error.
E. F. Trabue, for defendant in error.

Before SEVERENS, Circuit Judge, and KNAPPEN and SANFORD, District Judges.

SEVERENS, Circuit Judge. This is an action in the nature of a common-law action of debt brought in the District Court by the United States against the Illinois Central Railroad Company to recover penalties of $100 each for 22 alleged infractions of Safety Appliance Act March 2. 1893, c. 196, § 6, 27 Stat. 532 (U. S. Comp. St. 1901, p. 3175), each offense being set out in a separate count. Some of these counts were for hauling cars in interstate traffic with defective automatic couplings, some with defective grab irons and some with drawbars not on the proper level above the track. There was a plea of not guilty to each count, and special matters of defense were alleged in the several answers. The issues were tried by a jury. A stipulation as to certain facts was made by the attorneys for the parties and filed, of which the following is a copy:

"Defendant, for the purpose of this case, admits:

"(1) That it is a corporation doing business in Illinois and Kentucky, and is a common carrier, transporting over its railroad in Kentucky both cars carrying interstate commerce and cars carrying shipments wholly intrastate.

"(2) That each of the cars in paragraphs 1, 5, 6, 7, 10, 11, 12, 14, 15, 16, 17, 18, 19. 20. 21. and 22 contained interstate shipments; that each of the cars mentioned in paragraphs 4, 9, and 13 transported shipments purely intrastate, i. e., from one point in Kentucky to another point in Kentucky, and that each one of said cars was hauled by defendant in a train in which there was at least one other car that at the time contained an interstate shipment; and that the engines mentioned in paragraphs 2, 3, and 8 were used by defend-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ant wholly between points in Kentucky, to wit, between Louisville and Central City, and that said engines hauled trains at the times mentioned in said paragraphs 2, 3, and 8 composed of cars, some of which contained traffic purely intrastate, and each one of which trains contained the car mentioned in said paragraphs respectively containing interstate freight."

Evidence bearing upon the issues was adduced by the parties, and the jury, having been instructed by the court, rendered a verdict for the plaintiff on seven of the counts in the sum of $100 each, and for the defendant on the other 15. The plaintiff brings the case here on a writ of error.

The first question arises upon a motion to dismiss the writ upon the ground that the proceedings in the court below were essentially of a criminal nature, and that the United States cannot have a writ of error upon proceedings of that description. It seems proper to advert to certain fundamental considerations upon which the procedure in such cases as this rests, and upon which the determination of the question here raised depends.

It is urged by counsel for the defendant that the punishment prescribed by the sixth section of this act is a penalty, that the proceeding for its enforcement is criminal in its nature, and that therefore trial of the cause is to be governed by the rules of evidence, and the right to have a review in an appellate court is to be determined by the law applicable to a criminal prosecution. It may be admitted that in a sense the punishment prescribed by the act is a penalty. But penalties are of different sorts. They may consist of a sum of money which the offender shall pay in atonement for his forbidden act—in other words, of a fine—or shall suffer some other form of forfeiture of property, or they may consist of the infliction of the corporal punishment of the guilty party, or they may consist of both of these punishments. The public through its government may employ, within certain limitations, such of these various forms of punishment as it may deem just and necessary to the common welfare. Offenses range in respect of their turpitude from the smallest to the greatest, and the theory of punishment is that it shall be measured by the gravity of the offense. While it is true that the Constitution and laws of the country are prescribed and enforced for the protection of property as well as of the person, yet they regard with greater concern the protection of the latter. And so, when for small offenses a pecuniary punishment is prescribed as the atonement, it has long been the practice to employ a civil action for its recovery. Assuming that the punishment is just, the consequences to the defendant are not far different from those which happen in civil actions, only it is the government which is the plaintiff. The consequences of the judgment are substantially the same to him as if the penalty was bestowed upon a private party, except with regard to the scintilla of interest he has in the public revenue. If the public may, for a sufficient reason, compel the defendant to pay a fine, it is of little importance to him whether the government keeps it for its own purposes or turns it over to another who is already indemnified. Mere academic discussions of the theory of the practice by which it is done do not interest him. Probably in all the systems of law in the state and federal governments

there are instances where to civil liabilities there are attached penalties, there being something wanton or gross or otherwise peculiar to the liability. Yet such penalties are enforced in civil actions.

A very cogent, not to say persuasive, argument was addressed to us, founded upon the prohibition of the Constitution against subjecting a person to be twice put in jeopardy for the same offense. It is urged that this prohibition extends to a review of the trial in an appellate court; and, further, that it applies not only to prosecutions for crimes, but to prosecutions for misdemeanors also. And we must suppose that it is thought that the protection afforded thereby extends as well to artificial as to private persons; for the defendant here is a corporation. And if a private person may invoke it in a case when only the forfeiture of property is involved, there is color for the claim that a corporation may invoke it in a like case. This seems to us to be pushing the doctrine a long way and beyond its hitherto recognized scope.

We held in United States v. Baltimore & O. S. W. R. R. Co., 159 Feb. 33, 38, 86 C. C. A. 223, and again in the case of United States v. Louisville & Nashville R. Co. (recently decided) 167 Fed. 306, that the government was entitled to prosecute a writ of error from this court to the District Court to review the proceedings in an action of debt to recover a pecuniary penalty which alone was the punishment prescribed. To this ruling we adhere. The result is that the motion to dismiss must be overruled.

The principal questions upon the merits are two, and they arise upon the instructions given by the court to the jury: First. Whether, on the trial of an action such as this, the rule of the criminal law that the evidence must satisfy the jury of the guilt of the respondent beyond a reasonable doubt applies. Second. Whether the judge correctly stated the law to the jury when he said (as he did in substance) that if the defendant equipped the cars with the proper appliances as required by the act, and thereafter exercised the utmost degree of care and diligence in the discovery and correction of defects therein which could be expected of a highly prudent man under similar circumstances, it would have discharged its duty, and would not be liable to the penalty prescribed by the statute.

Respecting the first of these questions, we have little to add to what we said in United States v. Baltimore & O. S. W. R. Co., supra, and the observations already made in discussing the motion to dismiss the writ of error. It is impossible for us to distinguish this case upon any substantial ground, so far as concerns the present question, from that of United States v. Zucker, 161 U. S. 475, 16 Sup. Ct. 641, 40 L. Ed. 777, where, on the trial of an action by the United States to recover the value of merchandise forfeited by a fraudulent importation, the case turned upon the admissibility of certain evidence. If the action was of a criminal nature, it was inadmissible. If it were not, it should have been received. The question was much discussed by Mr. Justice Harlan, and the result was that the court held that the evidence should have been received, and this upon the ground that it was not a criminal proceeding.

We have referred to instances where, in the enforcement of civil liabilities, penalties incurred by wrongful neglect to discharge them are also enforced; and yet we are not aware that it has ever been supposed that the rule of the criminal law respecting the degree of proof was to be imported into the trial of the civil action. The giving of such a remedy as that specified by the sixth section, without any restriction or condition, imports an action at law with the customary incidents of such an action. Being a remedy which does not touch the person, there is no such urgency for protecting him as to require that the rules for the conduct of a civil suit should be displaced and those of a criminal proceeding be taken in. We think the law does not sanction such an anomalous compound in legal proceedings. If, indeed, there be no substantial distinction between a case where the government retains the fine and one where it is given to a private party in excess of his otherwise legal right, there are decisions in point which hold that where the suit is a civil action for a penalty the evidence is sufficient if it preponderates, and need not be such as to remove all reasonable doubt. Roberge v. Burnham, 124 Mass. 277; O'Connell v. Leary, 145 Mass. 311, 14 N. E. 143; Louisville & N. R. Co. v. Hill, 115 Ala. 334, 22 South. 163; People v. Briggs, 47 Hun (N. Y.) 266.

We are therefore of opinion that the court erred in its instruction to the jury in this regard.

As the judgment must be reversed for the error above shown, we think it necessary to consider and dispose of the other allegations of error above stated, to the end that the court below may not be vexed with the same questions, which, as seems quite certain, will arise upon the new trial. The trial of so many causes of action upon one petition creates, as it did for the court below, some embarrassment in dealing with the questions which arise upon the several counts of the petition. Moreover, upon the new trial the evidence may not be the same as that given on the first. Evidence of new facts may be adduced, which, as we should think, would be desirable in order to make proper conclusions upon the merits of the several cases included in the petition. We shall best subserve the present purpose by indicating the general principles by which in our opinion the trial should be governed in respect to the subject we are now considering.

The instruction given to the jury in regard to the measure of the duty imposed upon the railroad company by the provisions of the safety appliance act was in the main, but not altogether, substantially in accord with the construction which we gave to them in the case of St. Louis & S. F. R. Co. v. Delk, 158 Fed. 931, 86 C. C. A. 95. It is urged, however, by counsel for the government that our opinion in that case has been overruled by the opinion of the Supreme Court in the case of St. Louis, Iron Mountain & S. Ry. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061. If this seemed to us with certainty to be so, we should of course be bound to yield our own opinion to the superior authority of that court. But if the judgment of the Supreme Court has not concluded the questions now presented, we think the duty incumbent upon this court is to follow its own decision, unless, indeed, it should become convinced that it was wrong. Thereupon, it will remain for the Supreme Court to determine whether the ruling it

has announced is to be extended to facts such as those of the present case.

The question recurs, to what extent is a judgment of a superior court of controlling authority? We do not allude to that respect and confidence which is always due to every expression of opinion of the superior court from the subordinate court, but to those declarations of essential import resting upon the facts and leading to the conclusion manifested by the judgment. Declarations of law bearing upon the issues and indicating the proper judgment thereon are binding. The facts and law of the instant case only are in the eye and thought of the court. But expressions of opinion as to how the law would be upon facts essentially different from those in issue are not controlling, in another case when such different facts and issues are presented. These rules have been declared on many occasions by the Supreme Court itself, and no appellate tribunal has more strongly emphasized them. Cohen v. Virginia, 6 Wheat. 264, 399, 5 L. Ed. 257; Northern Bank v. Porter Tp., 110 U. S. 608, 4 Sup. Ct. 254, 28 L. Ed. 258; Plumley v. Massachusetts, 155 U. S. 461, 471, 474, 15 Sup. Ct. 154, 39 L. Ed. 223; Hans v. Louisiana, 134 U. S. 1, 10 Sup. Ct. 504, 33 L. Ed. 842; United States v. Wong Kim Ark, 169 U. S. 649, 679, 18 Sup. Ct. 456, 42 L. Ed. 890; Harriman v. Northern Securities Co., 197 U. S. 244, 25 Sup. Ct. 493, 49 L. Ed. 739; Downes v. Bidwell, 182 U. S. 258, 21 Sup. Ct. 770, 45 L. Ed. 1088.

In the case of St. Louis, etc., Ry. Co. v. Taylor, supra, the suit was an action to recover damages for a personal injury, and not a penal action such as is provided by section 6. It was founded upon the provisions of those sections of the act which relate to the subject of equipping the cars, and was not a prosecution for the use of such cars.

We gather from the facts stated in the opinion in the Taylor Case that the defect in the couplings of cars existed when the cars started on their journey, and that plates of metal, called "shims," were provided for temporarily remedying the inequality in the height of the drawbars. If that was so, the railroad company was chargeable with notice of the defective condition of the drawbars when the cars were sent out, and was at fault in not putting them in order, and did not relieve itself by trusting to its employés the making of the temporary makeshifts.

Whether the Supreme Court would apply the rule laid down in the Taylor Case to an action brought by the government for a penalty under section 6 of the act, we do not know. While we have held that, in giving an action of debt to recover a penalty, the implication is that the procedure, the pleading, the evidence, and the review of the proceedings are to be such as are incident to an action of debt, a question of much importance remains, which is whether, the offense being penal, the court is not to have regard to the constituents of the offense itself, and determine its quality by the tests of the criminal law. In other words, does the mere fact that the remedy is a civil action relieve the government from proving that the offense charged was criminal in its nature, and, specifically, was committed in willful neglect of the duty prescribed by law? The distinction between a remedy and

the cause of action is clear enough, but the answer, notwithstanding anything decided in Taylor's Case, is doubtful. Though involved in the case before us, the question has not been raised or discussed. We incline to think it should be answered in the negative, but we do not decide it.

This case was tried before the decision of the Delk Case. But the opinion of the court as expressed in its instructions to the jury, in most respects, proceeded along the lines of our opinion in the case alluded to. In this latter case the facts were that the car, on which were the defective couplings, had been sent back by the Belt Line because of the defect. It had been on the dead track in the yard to await repairs, which had been sent for, and was in the midst of other cars. It became necessary to move the defective car along the track in order to release and get out the other cars. It was during this operation that the plaintiff was hurt. There was evidence from which the jury might have found that the first knowledge which the defendant had of the defect in the coupler was when the car was sent back to it and it put the car on the "dead track" for repairs, and that it had done nothing toward actually promoting the transit of the car toward its destination. It was for the time being "tied up" for repairs. Still, as the majority of the court held, it was nevertheless engaged in interstate commerce, its freight not having yet been discharged. What we said in our opinion had reference to a case so circumstanced. We were not engaged in laying down universal rules upon the general subject, but only such as we conceived to be applicable to the facts of the case then before us. In effect, we concluded that if the defect had occurred at some previous time and the defendant had knowledge of it, or should, with reasonable diligence, have had notice of it, and with such knowledge, actual or implied, continued, without some justifying necessity, to haul the car upon its tracks while laden with goods which were the subject of interstate traffic, it would thereby violate the statute. We still concede that to be so. We think, further, that the railroad company would be liable if it starts in transit a car with a coupling containing a defect which could have been discovered by inspection; and vice versa, if a car when started in transit had no discoverable defect, the railroad company would not be liable to the penalty for a use of the car in the same transit by reason of a defect occurring during transit, provided there has been no subsequent lack of diligence either in discovering or in repairing the defect.

We are of opinion that, when the government has proved that a car laden for interstate traffic and with defective couplings has been hauled upon its tracks, the railroad company is bound to prove exculpatory facts, such as that it has used all reasonably possible endeavor to perform its duty to discover and correct the fault. We think, for example, that the court was in error in charging the jury that in the case of the cars coming from Mound City the jury might indulge the presumption that the appliances of the cars were in proper condition when they started, and that they remained so until such time as they were shown to be otherwise. We think the burden of proof was on the other party.

With regard to the sufficiency of the proof in view of the fact that the action is a civil action and is for a penalty, we have already expressed our opinion.

Now, as an original proposition we are unable to understand why it was, if Congress intended to enact such a law as it is now contended this law is, it should, after having proposed to itself the enacting a law "to promote the safety of employés and travellers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers," and having used fitting language to carry that purpose into effect and nothing more, have failed to declare that, having so equipped its cars with the couplings, the carrier should be required at all times and in all circumstances when in use to have them in effective condition. To hold that Congress has done this is to insert an interpolation into the act, and to make this interpolation such as shall require things confessedly impossible and to be apologized for by saying, as counsel for the government insist that we should, the law is so written; that it is a matter for the Legislature, and not for the courts, to determine. Is this a proceeding to be justified in order to make the statute mean what the counsel think the law ought to be? It seems clear to us that Congress, having accomplished its purpose by requiring carriers to equip their cars in the manner prescribed and to continue such equipment, was content to leave the incidents of their use to be regulated by the rules and principles of the common law.

Generally, the accepted rule is that if a given construction of a law leads to such results that it seems harsh, unreasonable, or to be performed with a great excess of difficulty, the court, on seeing such a prospect, will turn back to see if a construction is possible whereby such consequences can be avoided and another construction imposed having a more reasonable result. Such an act, we think, ought not to be so construed as to imply the intention to impose these consequences, unless its provisions are such as to render the construction inevitable. A time-honored rule for the interpretation of statutes forbids it. Said Mr. Justice Field, in delivering the opinion of the Supreme Court in United States v. Kirby, 7 Wall. 482, 19 L. Ed. 278:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislation intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

This statement has been repeated by that court in numerous cases since that time; the latest being perhaps that of Jacobson v. Massachusetts, 197 U. S. 11, 25 Sup. Ct. 358, 49 L. Ed. 643. It is the opposite of this to recognize a hardship, an injustice, and then to fortify the way to it by adopting the fatalistic answer, "thus saith the law." And it is, indeed, worse than this if the law does not say it at all. It is to assume the conclusion and then mold the premises so that they may justify the conclusion. Accidents will happen, and at places more or less remote from places of repair, or where the car cannot be left upon the track without peril to the public as well as to the employés.

Undiscoverable defects may at any time appear while the car is moving on the track in a train, and it has been hauled in that condition before it can be known. We are not prepared to believe that Congress intended to impose a law upon a business of public utility which cannot be carried on without more or less frequent violations of such law, and to fasten thereon a liability to prosecution as for a crime or misdemeanor.

Among the fundamental legal principles, Broom in his Legal Maxims, *238, classes the maxim "Lex non cogit ad impossibilia," a rule of law which applies to statutes of the most positive character, statutes which cannot by any rule of construction be so interpreted as to prevent the certainty of the result. And in his commentary upon it he says:

"The law in its most positive and peremptory injunctions is understood to disclaim, as it does in its general aphorisms, all intention of compelling to impossibilities and the administration of laws must adopt that general exception in the consideration of all particular cases."

While this maxim is not uniformly applicable, as, for instance, when the statute relates to a dangerous business and gives a private remedy, we think it is a proper one to apply in the construction of a law inflicting a penalty, and the business to which it relates is not itself unlawful.

It was upon the application of this maxim that the case of Chew Heong v. United States, 112 U. S. 536, 5 Sup. Ct. 255, 28 L. Ed. 770, was decided. The Chinese exclusion acts of 1882 (Act May 6, 1882, c. 126, 22 Stat. 58), and 1884 (Act July 5, 1884, c. 220, 23 Stat. 115), forbade the re-entry of a Chinese laborer without the production of the collector's certificate, which by these acts he should obtain on leaving the United States. But he had left prior to the date of the acts, and so, of course, could not have obtained the certificate. By the treaty with China of 1880 (22 Stat. 826), being resident here, he was entitled to go abroad and return without hindrance or condition. Congress, however, had the power to pass laws in derogation of the treaty. But although the denial of the right to return without the certificate was peremptory, the court held that in this the act required an impossibility, and, for the purpose of saving the right given by the treaty, it was to be presumed that Congress did not intend its prohibition to be absolute, and that the statutes should be so construed as to avoid an unreasonable or unjust result.

On the argument, counsel for the government, when asked what language of the act created the absolute duty contended for, referred to the last clause in section 2, which is, "and which can be uncoupled without the necessity of men going between the ends of cars," as if that language constituted an independent requirement. But this language is descriptive of the equipment required, and imports nothing in regard to the duty of the carrier when from accident, or some other cause without his fault, the equipment becomes deranged. And, because the statute does not make any command in that regard, the general law supplements the duty of the carrier by declaring that he shall use the utmost diligence in having the defect corrected. By this har-

monious co-operation of statute and common law, the intended result is worked out without any unjust consequence.

The court is not at this time made up of the same members as it was when the Delk Case was decided, but all are agreed that the decision was right as applied to a defect occurring during transit, and that so applied we should abide by it unless it shall be overruled by the Supreme Court. Still, if it should be held that our decision in the Delk Case was wrong, it does not necessarily follow that in this suit for a penalty the court below was also wrong in giving the instruction complained of.

The result of these considerations is that, for the error in the instruction regarding the sufficiency and cogency of the proof required, the judgment must be reversed and a new trial awarded.