## GALVESTON, H. & S. A. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. October 7, 1912.)

### No. 1,949.

RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—CONSTRUCTION—AIR BRAKES—DEFECTS IN TRANSIT—REPAIR.

Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), makes it unlawful to use in interstate commerce any locomotive not equipped with a power driving wheel brake and appliances for operating the train brake system, or to run any train in such traffic which has not a sufficient number of cars in it so equipped with power or train brakes that the engineer can control its speed without requiring the brakeman to use the common hand brake for that purpose. Pending suit by the United States for penalties alleged to have been incurred by defendant's operation of a train in interstate commerce on which the power brake system had become disabled in transit, Act Cong. April 14, 1910, c. 160, 36 Stat. 298 (U. S. Comp. St. Supp. 1911, p. 1327), was passed, supplementing the prior act, and providing that where any car shall have been properly equipped, and such equipment shall become defective while the car is being used on the carrier's line of railroad, the car may be hauled from the place where the equipment is first discovered to be defective to the nearest available point where such car can be repaired without liability for the penalties imposed by the act, etc., if such movement is necessary to make such repairs and they cannot be made except at the repair point. *Held*, that the amendment should be considered as a congressional construction of the act of 1893, and hence where the power brake system of a locomotive drawing an interstate train became defective in transit, and there were no facilities for repairs at the place where the break occurred, defendant was not liable for penalties under the act in transporting the locomotive and train to the nearest repair point for the purpose of repair.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

Shelby, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Texas.

Action by the United States against the Galveston, Harrisburg & San Antonio Railway Company to recover penalties for violation of

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the Safety Appliance Act. Judgment for the United States, and defendant brings error. Reversed and remanded, with directions.

This action was brought to recover penalties for an alleged violation of the act of Congress, known as the Safety Appliance Act, approved March 2, 1893 (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), as amended by an act approved April 1, 1896 (29 Stat. 85, c. 87), and as amended by an act approved March 2, 1903 (32 Stat. 943, c. 976 [U. S. Comp. St. Supp. 1911, p. 1314]), and also for violation of the order of November 15, 1905, by the Interstate Commerce Commission. The bill of exceptions shows the following proceedings before the court and jury:

United States v. Galveston, Harrisburg & San Antonio Railway Company.
No. 126.

Be it remembered that on the 12th day of April, A. D. 1909, came on for trial the above styled and numbered cause, and thereupon a jury was impaneled and sworn to try the same, when the following agreed statement of facts and supplementary evidence was read and offered to the jury, and was all the evidence adduced on the trial of the case:

"1. That the defendant railway company is a corporation, duly organized and doing business under the laws of the state of Texas, and having an office and place of business at El Paso, in the county of El Paso, and state of Texas.

"2. That said defendant is a common carrier engaged in interstate commerce among the several states and territories of the United States, and particularly of the state of Texas, and was so engaged in said interstate commerce on April 13, 1909, when it hauled upon and over its line of railroad from a point on said line 1½ miles west of the station of Rosenfeld, into Sanderson, in Pecos county, in the state of Texas, within the jurisdiction of this court, one train, to wit, 'Extra East,' drawn by locomotive engine No. 826, said train containing interstate traffic, and was composed of 41 cars, including the engine drawing said train, all of which were equipped with power and train brakes, and the engine with a power brake wheel, as required by the act of Congress known as the 'Safety Appliance Act,' and the amendments thereto, but that when said train arrived at Sanderson none of the cars in said train had their brakes used and operated by the engine of the locomotive drawing said train.

"3. That when said locomotive engine drawing said train left said defendant's terminal station at El Paso, Texas, the said engine and train were fully equipped with power and train brakes, which were so associated together that said train brakes could be used and operated in the movement of said train, and were so used in the operation of said train by the engineer of the locomotive drawing said train, but that while in transit on its line of railway between its terminal stations of El Paso and Sanderson, Texas, a mile and a half east of the station of Rosenfeld, the low pressure reverse piston and valve in the steam end of the air pump on said engine broke, which rendered it impossible for the engineer on said engine, No. 826, to further use said brakes in the movement of said train.

"This agreement is not intended to cover the issue of fact as to whether repairs could not have been made on said engine short of the terminal station of Sanderson, as alleged in defendant's answer, or that said train could not have been set out on the siding at Rosenfeld, or on either one of the two sidings between Rosenfeld and Sanderson, and as to these two matters above stated evidence will be submitted, nor shall this agreement preclude either plaintiff or defendant from offering evidence on any other issue of fact other than those above specified."

C. J. Hankamer, introduced on behalf of the defendant, being duly sworn, testified as follows:

"On the 13th day of April, 1907, I had charge of the engine, as engineer,

that pulled the 40 cars in question. When we were about a mile and a half east of Rosenfeld the pump broke down; the reversing piston in the air pump, in the steam end of the air brake. I had no facilities for repairing the pump there where the accident occurred. The break stopped the pump from working. It wouldn't make any air. Prior to that time the pump was in first-class condition. Sanderson was the nearest place to the place of the accident at which this break could be repaired. Sanderson is a terminal of the railway, where they have machine shops and mechanics for the purpose of repairing such breaks. From Rosenfeld there was no other place short of Sanderson. I had no appliance with which to make the repairs to the pump, and it had to be taken to Sanderson, the nearest place, to be repaired. I was going east at that time. The distance from Sanderson to Rosenfeld is about 24 miles, I think; somewhere along there. The pump was repaired at Sanderson when I took it in. I carried the train in from the place of the accident to Sanderson by using the hand brakes. The repairs couldn't have been made anywhere else, except at Sanderson, unless they had sent a machinist out there to do the work. I did not have the material out there to make the repairs, and the machinist would have had to bring the material to do the work. It would have taken two hours to repair the pump after they had gotten everything to do it with. There were no facilities at the place of the accident for doing that kind of work, and there were no mechanics there. We were a mile and a half east of Rosenfeld when the pump broke down. Between the place of the accident and Sanderson there were three side tracks that could have accommodated this entire train. The nearest one from where we were when the pump broke was about 7 miles. That was the siding at Longfellow. The next siding was at Emerson, which was about 7 miles from Longfellow, and there was another siding between Emerson and Sanderson, about 3 miles from Emerson. At these three sidings there are no facilities for repairing engines and such breaks as the one that occurred. At the time of this accident there were lots of trains on the road, and we needed all passing tracks. We got an order at Longfellow to hold us out until they got a train out of Sanderson. The Sanderson yard was blocked with trains. The traffic at that time was unusually heavy. We met three trains after the pump broke. They passed us going the other way. My train was a freight. We had means of communicating with Sanderson after we got to Longfellow. As to whether we could communicate with Sanderson at the place where the pump broke, I do not recollect whether our caboose had a phone or not; I am not positive; I do not know. We couldn't communicate from the engine. Sanderson was a repair station, where they kept mechanics and material and shops for doing such repair work as our engine needed, and all other defects and breaks connected with the railroad service, and that was the nearest station where facilities and mechanics could be had."

Cross-examined, the witness testified: "After the air pump on the engine became inoperative, none of the power brakes on any of the cars could be used, except by hand; there was no air on them. The only method after that was by hand brake. We could not have backed the train to the siding at Rosenfeld without sending out a flagman to protect us. If we had adopted that plan, I guess there was nothing to prevent us from backing the train back to the siding at Rosenfeld. I think the siding at Rosenfeld was of sufficient length to have accommodated our entire train. We communicated with Sanderson from the Longfellow telegraph station. There is no telegraph station at Rosenfeld; just a blind siding. The distance from where the accident to the pump occurred to Longfellow was about 7 miles, I think; about 7 or 7½ miles. We took the siding at Longfellow, and remained on that siding, as well as I can remember, about two hours, I think. It would take a locomotive with one car about 40 minutes to make the run from Sanderson to Longfellow; I guess it would take about 35 to 40 minutes, or 50 minutes. There were no repair shops at Longfellow; the repair shops were at Sanderson. As to whether the material could have been brought out there and the pump repaired where the accident occurred, the machinist would have had to come there and examine the pump and see what was the matter, and

then send for the material and fix the pump. As to whether he could not have been informed by wire what the trouble was, so he could bring the material with him, I do not believe two men can take that pump out and see what was the matter with it; two men couldn't take the pump down; the works on the pump are so heavy that two men couldn't have handled it. As to whether we had more men on the train to help in the work, the pump is supposed to be taken apart by mechanics. With the aid of the two brakemen on the train, probably we could have taken it apart; I don't know. I guess I could have taken it apart, if I had had the proper tools to do it with. I guess a mechanic could have made the repairs at the place where the accident occurred, as well as at the shops, if he had had the proper tools to do it with. If the mechanic at Sanderson had been notified by wire what the trouble was with the air pump, and had come up there equipped in a manner so as to repair it on the siding, I guess it could have been done there. The run from Sanderson up there could have been made in about 40 or 45 minutes. It is downgrade all the way from Rosenfeld to Sanderson, and all the way down the hand brakes on the cars had to be used in braking the train when we made the run into Sanderson. At Emerson there was another siding. Emerson is about 8 miles from Sanderson. The siding at Emerson was sufficient to have accommodated our train, if we had desired to take it, if there were no cars on it. I do not recollect whether there were or not. Two trains passed us at Longfellow, a passenger and a freight. We met two trains there. A locomotive, properly equipped, attached to our train after the air pump broke, could have handled the train and operated the power brakes. Accordingly, if an engine had been taken from one of the trains passing us, or if an engine had been sent to us from Sanderson, it could have pulled our train into Sanderson, and could have operated the power brakes."

Redirect examination: "After the accident to the air pump, we didn't have anything but the hand brakes to operate. After the accident, we could go neither forward nor backward and use the air brakes. The engine was all right, but the air brakes were inoperative. The breaking of the pump destroyed the air. We couldn't use anything but the hand brakes."

Recross-examination: "I stated that a passenger and a freight train passed us while we were at the place where the accident occurred. Those trains were going west. We met them there at Longfellow. I also stated that we were detained there on account of the yard being blocked at Sanderson. We couldn't get in on account of the yard being blocked with trains. The conductor told me that he had to stay there until they got a train out of Sanderson on account of the yard being blocked; they held the board on us. We wired the train dispatcher at Sanderson from Longfellow, and he told us to take the train into Sanderson by hand brakes."

It is further agreed between the parties that 17 trains passed the freight train in question on the day that said air pump on the freight train broke.

El Paso, Texas, April 13, 1909.

I hereby certify that the foregoing is a true and correct transcript of all evidence adduced on the trial of the above-entitled cause.

W. H. Long, Official Stenographer.

And thereupon, the evidence being closed, the court instructed the jury to find for the plaintiff in the sum of $100, and to the action of the court in so instructing the jury to return a verdict for the plaintiff, and in open court before the jury returned their verdict, the defendant then and there excepted, and also excepted to the judgment rendered thereon.

Before PARDEE and SHELBY, Circuit Judges, and GRUBB, District Judge.

T. J. Beall, of El Paso, Tex., for plaintiff in error.

Chas. A. Boynton, U. S. Atty., of Waco, Tex., and Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C.

PARDEE, Circuit Judge. Involving the construction of the Safety Appliance Acts, two classes of suits, one for injury to employés and the other to penalize the railroads for noncompliance, have been passed upon by the courts. In the first it has been substantially settled that the duty on the railroads was absolute, and noncompliance without excuse. St. Louis & Iron Mountain R. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061. In the other class, decisions have been conflicting; the Supreme Court not having passed on the precise question involved.

Without reviewing the many cases cited in the briefs, or attempting to distinguish or harmonize them further than to note that in nearly all no distinction is made as to whether the violation was voluntary, or the result of accident, without fault, and the resulting necessities, reference is made to two decisions in the Circuit Courts of Appeal which seem to the writer correctly reasoned and decided:

Chicago, Northwestern Ry. Co. v. United States, 168 Fed. 236, 93 C. C. A. 450, 21 L. R. A. (N. S.) 690, where it is said:

"The object of the safety appliance statutes was manifestly to require interstate carriers to maintain their rolling stock in a certain condition of safety. It could not have been the intention of Congress to impose this duty upon carriers, and at the same time deprive them of the only practical method of meeting its requirements. Rolling stock must necessarily become defective, within the terms of these statutes, both by use and by accident. Repair shops cannot be kept on wheels. Such shops cannot be brought to the defective vehicle. The only practical method of railroading requires that such vehicles, when out of repair, shall be taken to the shops; and if they are wholly excluded from commercial use themselves, and from other vehicles which are commercially employed, they do not fall within any of the classes covered by the safety appliance acts. A carrier may move one or more cars by themselves to repair shops, for the purpose of having them placed in condition to conform to the safety appliance acts, without being guilty of a violation of those acts while thus engaged in an honest effort to meet their requirements."

And United States v. Illinois Central R. Co., 170 Fed. 542, 95 C. C. A. 628, holding:

"An interstate railroad is guilty of violating Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), if it starts in transit a car containing interstate commerce with a defective coupling, which could have been discovered by inspection, but not so if the car, when started, had no discoverable defect, but developed one in transit, and there was no subsequent lack of diligence either in discovering or repairing the same."

Pending this suit, Congress passed an act, approved April 14, 1910 (36 Stat. 298, c. 160 [U. S. Comp. St. Supp. 1911, p. 1327]), the title of which is as follows:

"Chap. 160. An act to supplement 'An act to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes, and their locomotives with driving wheel brakes, and for other purposes,' and other safety appliances acts, and for other purposes."

The proviso in section 4 of that act is as follows:

"Provided, that where any car shall have been properly equipped, as provided in this act and the other acts mentioned herein, and such equipment shall have become defective or insecure while such car was being used by

such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discovered to be defective or insecure, to the nearest available point where such car can be repaired, without liability for the penalties imposed by section 4 of this act, or section 6 of the act of March second, eighteen hundred and ninety-three, as amended by the act of April first, eighteen hundred and ninety-six, if such movement is necessary to make such repairs, and such repairs cannot be made except at such repair point."

By incorporating the provision just quoted, and declaring the same as a supplement to the act of 1893, we may safely infer that it was intended by Congress to give the proper construction to the act of 1893.

If this view is correct, then it seems clear that the instant case should be reversed and remanded, with instructions to award a new trial and thereon, on the same evidence being given, to direct a verdict for defendant below, for the case shows that the engine and train were admittedly in perfect condition as required by the statute when started, and that the break occurred suddenly after going at least 300 miles, and that, as there were no facilities for repairs at the point where the break occurred, it was carried to the first and nearest repair point for the purpose of repair.

However this may be, this court is of opinion that on the evidence in this case the question of good faith and proper diligence in clearing the tracks and in moving the train for repairs was one of fact, and should have been submitted to the jury.

The judgment of the District Court is reversed, and the cause is remanded, with instructions to award a new trial.

SHELBY, Circuit Judge, dissents.

GRUBB, District Judge. I concur in the judgment of reversal, and in the opinion of the court, in so far as it holds that the cause should have been submitted by the court below to the jury.

While the language of section 2 of the act of March 2, 1903, might permit of a construction that would impose an absolute duty on the carrier, and absolute liability for the penalty provided for operating its train when not equipped as required, and while some courts have so construed it, I agree with the majority opinion that this would not be a reasonable interpretation of the original statute, and that the amendatory act of April 14, 1910, was intended to be declaratory only of the court's interpretation, to meet the decisions mentioned. Under the act of March 2, 1903, before its amendment, I think the carrier, if its train left a repair point properly equipped, is not compelled, upon discovery of a defect between repair points, to hold its train at the point of discovery until the defect is remedied, in cases where it cannot be remedied at such point with the means at hand, but has the right to move the train in its disabled condition to the nearest repair point, if necessary to accomplish the repairs.

The courts are in conflict as to whether the statute permits this movement in connection with other cars being commercially used.

The original and amendatory statutes prescribe no such limitation, and it does not seem to me that a movement can be said for that reason alone to be inhibited as a matter of law. The question in each case depends upon whether there is shown to exist a reasonable necessity for moving the train to accomplish the repairs, and this is, ordinarily, properly determinable by a jury. It is true the facts in this case are undisputed, but an inference is required to be drawn from them, viz., whether they constituted the reasonable necessity demanded by the statute, or whether the carrier should have sent a mechanic from Sanderson to Longfellow to repair the air pump, or sent the disabled engine to Sanderson for that purpose, to be returned to Longfellow to take in the train with air power, or sent a relief engine to Sanderson for that purpose, instead of hauling the train to Sanderson with the disabled engine by hand brakes.

It seems to me that reasonable minds might reach different conclusions as to the proper inference to be drawn, and for that reason I think the issue should be submitted to the jury.