UNITED STATES v. PENNSYLVANIA CO.

(District Court, N. D. Ohio, E. D. July 2, 1915.)

No. 8791.

1. RAILROADS &#9758;229—OPERATION—FEDERAL SAFETY APPLIANCE ACT—CONSTRUCTION.

Federal Safety Appliance Act April 14, 1910, c. 160, § 3, 36 Stat. 298 (Comp. St. 1913, § 8619), provides that the Interstate Commerce Commission may upon full hearing and for good cause extend the period within which any common carrier shall comply with the provisions of the section with respect to the equipment of cars actually in service upon the date of the passage of the act. The Interstate Commerce Commission extended the time for the defendant railroad company to change and apply all appliances on freight cars so as to comply with the act for five years

from July 1, 1911, except that when a car should be shopped for work, amounting to practically rebuilding its body, it should be equipped according to the standards prescribed. A further provision of the act declared that when any car shall have been properly equipped as provided, and such equipment shall have become defective or insecure while such car was being used, it may be hauled from the place where such equipment was first discovered to be defective to the nearest available point where it might be repaired without liability for the penalty imposed. *Held* that, until expiration of the extension granted by the commission, the proviso extends to freight cars built and in service prior to July 1, 1911, which were not provided with all the required safety appliances, and which had not been shopped for work, amounting to practically rebuilding the body of the car before such cars became defective while in service.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. ☞229.]

2. RAILROADS ☞254(6)—OPERATION—SAFETY APPLIANCES.
    Under federal Safety Appliance Act April 14, 1910, a railroad company cannot justify the operation of a train without the required percentage of air brakes being in use, due to the fact that the empty, bad-order, and chained-up cars composing the train were in such condition that the operation was not reasonably possible without establishing that it was not reasonably possible to have repaired the cars, either permanently or temporarily, so that the air brakes could have been connected up and used, for the proviso allows movement of cars only when necessary to make such repairs, and such repairs cannot be made except at repair point.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 772; Dec. Dig. ☞254(6).]

3. RAILROADS ☞254(6)—OPERATION—FEDERAL SAFETY APPLIANCE ACT.
    A railroad company seeking to justify, under the proviso of federal Safety Appliance Act April 14, 1910, the movement of bad-order cars not equipped as required, has the burden of showing that it falls within the proviso; those setting up rights under exceptions in a statute being bound to prove them.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 772; Dec. Dig. ☞254(6).]

4. RAILROADS ☞229—OPERATION—FEDERAL SAFETY APPLIANCE ACT.
    Under federal Safety Appliance Act April 14, 1910, providing that, when any car shall have been properly equipped and such equipment shall have become defective or insecure while such car was being used, it may be hauled from the place where the equipment was first discovered to be defective, to the nearest available point where the car might be repaired, a railroad company cannot justify the hauling of cars past the nearest repair points to a far-distant repair point on the ground that the repairs could not be reasonably made at the nearer points because of congestion and insufficient forces of men, for the statute, being for the protection of employés and passengers, should be given such a construction as would prevent carriers from practically suspending its operation.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. ☞229.]

At Law. Action by the United States of America, against the Pennsylvania Company. Judgment for plaintiff.

This is a civil action brought by the United States to recover from the Pennsylvania Company penalties for claimed violations of the federal safety appliance acts (Act March 2, 1893, c. 196, 27 Stat. 531, as amended by Act April 1, 1896, c. 87, 29 Stat. 85; Act March 2, 1903, c. 976, 32 Stat. 943; Act April 14, 1910, c. 160, 36 Stat. 298 [Comp. St. 1913, § 8605 et seq.]).

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The petition contains 34 counts. The first 25 counts are based upon the hauling of that number of empty bad-order cars in a train from Mosier, Ohio, to Dock Junction at Erie, Pa., when one or both ends of each of said cars (with the exception of the car mentioned in the twenty-fifth count which was hauled by its own drawbars) were not equipped with automatic couplers as required by statute, but were fastened to adjoining cars by means of chains.

At Haselton, a station between Mosier and Dock Junction, 8 additional empty bad-order cars were put into this train and hauled by means of chains instead of drawbars. The twenty-sixth count is based upon the operation of this train, consisting of 25 cars from Mosier and 33 cars from Haselton, together with engine, tender, and caboose, when less than 85 per cent. of the cars were controlled by air brakes; the air brakes being operated on engine and tender only.

The case is submitted to the court upon an agreed statement of facts, a jury being waived.

It is stipulated in the agreed statement of facts that the railroad over which the train of bad-order cars was moved was a part of a through highway of interstate commerce; that the cars were not equipped as required by the federal safety appliance acts; that the train on leaving Mosier on July 25, 1913, consisted of 25 cars and caboose, and a locomotive engine and tender; and that at Haselton 8 more bad-order cars were added to the train, making a total of 36 cars if the engine, tender, and caboose is each treated as a car. All of the cars were equipped with proper air brakes, but only those upon the engine and tender were used during the journey.

The agreed statement of facts further shows the place in the Youngstown district where each of the 33 bad-order cars was discovered and the date upon which it was marked "bad order." These dates run from May 15th to June 29th, and it is stipulated that they were all empty when moved; that the train in which they moved was not a revenue train and had no cars in it which were commercially used or which contained live stock or "perishable" freight; and that all of the cars had originally been equipped as required by the safety appliance acts, except the act of April 14, 1910, and the orders of the Interstate Commerce Commission made pursuant to this act.

The statement also shows that the defendant company had repair tracks at Mosier at what is known as the Market Street Yards in Youngstown and at Haselton, which is a suburb of Youngstown, but that bad-order cars had accumulated and were accumulating at each of these yards beyond the capacity of the yards to take care of them. It appears that the defendant had repair tracks at Ashtabula which were also congested beyond capacity.

It is further stipulated that on the cars in the train which had broken end and center sills the air hose could not be coupled up without danger of their being pulled apart on account of the slack in the chains. The fact that the train was not being operated by air was conveyed to the engine and train crew engaged in the movement of the train, and it was operated at a speed of about 10 miles per hour the entire journey. The distance from Youngstown to Dock Junction is 97 miles; the distance from Youngstown to Ashtabula is about 60 miles. All of the cars of the train were built and in service prior to July 1, 1911, and none of them had undergone regular repairs or had been shopped for work amounting to practically rebuilding of the bodies of them.

It is also stipulated that witnesses for the defendant, if called, would testify that at none of the three repair yards of the defendant referred to herein was there any place on the repair tracks to handle cars in excess of the number then awaiting repairs between May 15 and July 26, 1913, having regard to the reasonably necessary and practicable method of operating the railroad; that the defendant hauled the cars from Mosier and Haselton to Dock Junction for the purpose of repairing them, although it was not physically impossible to have made the necessary repairs on other than the repair tracks at any of the three repair yards between May 15 and July 26, 1913; and that in moving such a train as this one was it is considered safer practice to have the air brakes used only on the locomotive and tender than to attempt to use them throughout the train.

Cary R. Alburn, Asst. U. S. Atty., of Cleveland, Ohio, and Monroe C. List, Sp. Asst. U. S. Atty., of Washington, D. C.

Squire, Sanders & Dempsey, of Cleveland, Ohio, for defendant.

CLARKE, District Judge (after stating the facts as above). [1] That the defendant violated the federal safety appliance acts in moving the cars described in the various counts in the petition in this case as it did move them is clear, unless such movement is authorized by the proviso in the act of April 14, 1910. The parts of this proviso which are important to consider read as follows:

> Provided, that where any car shall have been properly equipped, as provided in this act and the other acts mentioned herein, and such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired, without liability for the penalties imposed by section 4 of this act or section 6 of the act of March 2, 1893, as amended by the act of April 1, 1896, if such movement is necessary to make such repairs and such repairs cannot be made except at such repair point; * * * and nothing in this proviso shall be construed to permit the hauling of defective cars by means of chains instead of drawbars, in revenue trains or in association with other cars that are commercially used, unless such defective cars contain live stock or "perishable" freight. Section 4 (Comp. St. 1913, § 8621).

The act of April 14, 1910, after prescribing the equipments which all cars shall have, in section 3 contains this proviso, viz.:

> Provided, that the Interstate Commerce Commission may, upon full hearing and for good cause, extend the period within which any common carrier shall comply with the provisions of this section with respect to the equipment of cars actually in service upon the date of the passage of this act.

The agreed statement of facts shows that the cars in the train, movement of which is complained of, were all built and "in service prior to July 1, 1911," and Exhibit B is an order by the Interstate Commerce Commission providing in substance that carriers are granted an extension of five years from July 1, 1911, to change and apply all appliances on freight cars so as to comply with the standards prescribed by the commission in conformity to the act, except with respect to certain appliances designated which do not affect this case, and also except that when a car is shopped for work amounting to practically rebuilding the body of the car it must be equipped according to the standards prescribed by the commission. It is also provided that the extension of time thus granted must not be construed as relieving carriers from complying with the provisions of section 6 of the act of March 2, 1893, as amended April 1, 1896, and March 2, 1903.

First, the government contends that before the defendant can claim the privilege granted by the proviso of the act of April 14, 1910, a car must be equipped with all the appliances provided for and required by the safety appliance acts, including the act of April 14, 1910. As has been stated, the Interstate Commerce Commission was authorized by this act of April 14, 1910, to extend the time for compliance with its terms, and the commission on March 13, 1911, granted such

extension for cars such as were included in this train, as is shown by Exhibit B.

This order of the commission suspended the requirements of this act to a period long after the movement complained of in this case, and therefore the proviso under the stipulated state of facts should read as if written:

Provided, that where any car shall have been properly equipped, as provided * * * in the other acts mentioned herein, and such equipment shall have become defective, * * * such car may be hauled, etc.

To say that the proviso extends only to cars equipped as provided by the act itself would be to read out of it the provision for an extension of the time for complying with it which was granted to the commission and which was exercised before the movement complained of.

If the contention of the government is denied, there still remains obvious and large application for the proviso, and this court is of opinion that the effect of the proviso is to put a congressional construction upon the act agreeing with that which was put upon it by several courts, but was denied by others.

Substantially this construction was placed upon the act by the Circuit Court of Appeals of the Fifth Circuit in Galveston, H. & S. A. Ry. Co. v. United States, 199 Fed. 891, 118 C. C. A. 339.

It seems very obvious to this court that the strained construction thus contended for by the government must be denied.

[2] As applicable to the twenty-sixth count, the government contends that the proviso does not permit the operation of any train with less than 85 per cent. of the air brakes on the cars in such train in use and operated by the engineer. Emphasis is laid upon the fact that the word "car" in the singular number is used throughout section 4 of the act, including the proviso, and for that reason it is claimed the proviso does not include a train of cars in bad order.

Without going the length of accepting this contention of the government based upon the use of the word "car" in the singular number, the fact remains that the proviso is applicable only where the "movement is necessary to make such repairs and such repairs cannot be made except at such repair point."

Before the defendant can claim exemption from the penalties of the act under this proviso, it seems plain enough that it must establish to the satisfaction of the court and jury that such movement of a train of cars in the extremely bad order in which these cars were when moved was necessary in order to reach a repair point, and that it was necessary to move them in a train when the cars were in condition such that the operation of air upon 85 per cent. of them was not reasonably possible.

The agreed statement of facts shows that upon the cars which had broken end and center sills the air hose could not be coupled up without danger of their being pulled apart or uncoupled on account of the slack in the chains, and that witnesses, if called, would testify that upon such a train it was considered safer practice to have the air brakes only upon the locomotive and tender.

The question thus presents itself to the court whether the agreed statement of facts shows that it was necessary, reasonably necessary, to move these cars without placing them in a condition such that the air upon 85 per cent. of them might have been connected up and used. Any person at all acquainted with the subject-matter under discussion of this case knows that it is often possible to equip a bad-order car with drawbars with coupling appliances for the purpose of hauling it when empty or in a train of empty cars when it would not be possible to so equip it for use when loaded or in a train of loaded cars. There is no evidence in this case that it was not reasonably possible to have equipped these cars with drawbars and couplers or to have repaired them with such drawbars and couplers as were upon them to the extent necessary to the making of the movement complained of.

Confessing the bad condition of the cars, the burden was upon the defendant to show that it was necessary to move them with chains and without drawbars and automatic couplers such that the air might be coupled up and used on 85 per cent. of the cars of the train, and since the agreed statement of facts does not show that it was not reasonably possible to make such repairs, temporary or permanent, as would have made it possible to use the air brakes, this court is clearly of opinion that the defendant offended against the airbrake provision of the safety appliance acts, and that under the twenty-sixth count of the petition it is liable for the statutory penalty. Even if it should be concluded that the defendant could not repair the cars completely at any of the three repair points near which their defective condition was discovered, it would by no means follow, without more evidence than is furnished by the agreed statement of facts, that it was not reasonably possible to make such repairs at the Mosier, Market Street, or Haselton repair plants as would have made it possible to use the air brakes when the cars were being moved, not loaded.

[3, 4] Finally, the government claims that the agreed statement of facts does not show that the movement of the cars in question was made for the purpose of repair within the meaning of the acts of Congress, and so that it does not bring the defendant within the protection of the proviso.

In order to avail itself of the benefits of the proviso, the burden is plainly upon the defendant to bring itself strictly within its letter and reason. "Those who set up rights under such an exception must establish it." Ryan et al. v. Carter et al., 93 U. S. 78, 23 L. Ed. 807. Quoted and approved in Schlemmer v. Buffalo, Rochester, etc., Ry., 205 U. S. 1, 27 Sup. Ct. 407, 51 L. Ed. 681; United States v. Dickson, 15 Pet. 141, 10 L. Ed. 689.

The defendant as if recognizing its duty to establish repair points, sufficient in number, with such provision for the repair of cars and in such locations as the traffic of its road might reasonably require, prior to this movement had established three repair points: One at Mosier; one at Market street in the city of Youngstown (distant from Mosier easterly three or four miles); and one at Haselton (distant from Market Street easterly about the same distance).

It must be accepted from the agreed statement of facts that the necessary repairs of the cars under discussion could have been made at any time at these three points, had not a congestion of bad-order cars caused delay in making such repairs. Twenty-five of the cars in this train were hauled from the repair point at Mosier, near which they were discovered to be in bad order through and past the Market Street repair point and through and past the Haselton repair point, and then more than 80 miles to Dock Junction, where they were repaired. The other eight cars were hauled from the repair point at Haselton, near which they were first discovered to be in bad order, to Dock Junction for repairs. Such a movement of bad-order cars was obviously unlawful unless it was "necessary" within the terms of the proviso of the act of April 14, 1910.

The defendant recognizes this situation and claims that the "necessity" which justified this movement was that the provisions made for repairing cars at the three established repair points named were not sufficient with the force of men which had been used and was then being used to repair these cars because of the number of bad-order cars which had accumulated and were continuing at the time to accumulate.

The agreed statement of fact, as we have said, shows that the defects in the cars were first discovered near to one or the other of these three repair points, and that they were discovered at various times between the 15th day of May and the 25th day of July, which was the day of the movement.

The proviso exempts from the penalties of the act only a movement of equipment which becomes defective when in use on a line of railway, and then only the movement of it from the place where it is first discovered to be defective to the nearest available place where it can be repaired, and this only if such movement is necessary in order to make such repairs, and if they cannot be made except at such repair point.

The alternative to this movement of bad-order cars complained of was the enlarging of the yards or the increasing of the force of operatives at the repair yards at the points where the exigencies of its business had led the defendant to establish them. There can be no doubt that with larger yards or a greater force of men employed these cars could have been repaired at any one of the three points near which they were discovered to be in bad order. A construction should not be put upon such wise and humane legislation as these safety appliance acts certainly are which will permit a carrier at its option to create as the defendant did the "necessity" which shall exempt it from compliance with the law. Failure to have repair yards of adequate capacity or the failure to provide a sufficient force of men to repair cars which may become out of repair in the vicinity of the established yards of the carrier cannot be permitted to create the "necessity" which the proviso declares shall exempt the company from liability for the moving of such defective cars.

Such a movement as is complained of in this case and for such a distance, and under the admitted conditions as to the establishment

of repair points, does not come within the limited privilege given by the proviso that a bad-order "car may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired" without liability for the penalties imposed by section 4 of the act of Congress.

That the movement under discussion cannot be justified as a movement of empty cars by themselves, and so not coming within the terms of the act for the reason that they were not at the time of the movement in use in interstate traffic, is settled by Southern Ry. Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, which in effect overrules the decision in Southern Ry. Co. v. Snyder, 187 Fed. 492, 109 C. C. A. 344, which was rendered prior to Supreme Court decision.

The safety appliance laws are intended for the protection from injury of employés and passengers and for the facilitating of the conduct of interstate commerce, and, since experience has proved them to be of great value, a construction should not be placed upon them by the courts such as is contended for in this case, which would put it into the power of carriers to largely suspend their operations in a most important respect.

From the authorities cited and the foregoing discussion, it results that the finding must be in favor of the United States in each of the 34 causes of action pleaded in the petition.